Lynette MEYERS, By and Through her natural mother and general guardian Lena MEYERS, Lena Meyers; Melvin Holgate and Eugene Holgate, by and through their natural father, Jamie R. Holgate; Leonardo Bob Manheimer, by and through his natural parents, Leo Manheimer and Sara Manheimer; Lenora Manheimer; Rosita Johnson, by and through her natural father, Robert Johnson; and The Navajo Nation, Plaintiffs,

v.

BOARD OF EDUCATION OF the SAN JUAN SCHOOL DISTRICT, Preston Nielson, Bill Todachennie, Neal Crank, Paul Mantz, Pete Black, Defendants.

No. 93–C–1080J.

United States District Court, D. Utah, Central Division.

April 7, 1995.

---

Eric P. Swenson, Monticello, Utah, and Sarah A. Krakoff, DNA–People's Legal Services, Inc., Tuba City, Arizona, for individual plaintiffs.

Herbert Yazzie and Steven C. Boos, Navajo Nation Department of Justice, Window Rock, Arizona, for plaintiff Navajo Nation.

Scott M. Matheson, Jr., U.S. Attorney, Joseph W. Anderson, Asst. U.S. Atty., Salt Lake City, Utah, and Lawrence R. Baca, U.S. Dep't of Justice, Washington, D.C., for plaintiff-intervenor United States of America.

Brinton R. Burbidge, Von G. Keetch, Randy T. Austin, Kirton & McConkie, Salt Lake City, Utah, for defendants.

Jan Graham, Attorney General, William T. Evand and John S. McAllister, Assistant Attorneys General, Salt Lake City, Utah, for Utah State Board of Education and State Superintendent of Public Instruction.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

This action involves the right of Native Americans living on a remote part of the Navajo Indian Reservation to a free public education. The parties do not dispute that the plaintiffs are entitled to such an education. They only dispute who is responsible for providing it. For the reasons stated below, the court concludes that each of the governmental entities involved in this case has an obligation to see that the plaintiffs receive appropriate educational opportunities.

## I.

## BACKGROUND

The Navajo Mountain area of the Navajo reservation is located in extreme southern Utah, within the boundaries of San Juan County. It is bordered by Lake Powell on the north, by 10,388-foot Navajo Mountain on the west, by the impassable Paiute mesa on the east and by Arizona on the south. It is one of the most remote and inaccessible areas of the Navajo reservation and perhaps of the United States.[1] About two-thirds to three-quarters of the 1,700 Navajo Mountain residents live on the Utah side of the border; the rest live in Arizona.

The individual plaintiffs are apparently all Navajos who reside at Navajo Mountain. *See* Memorandum in Support of Joint Plaintiffs' Motion for Partial Summary Judgment (dkt. no. 72) [hereinafter Plaintiffs' Memo.] at 3, ¶ 2.[2] They are school-age children and their parents or guardians. The Navajo Nation is also a party plaintiff. The plaintiffs brought this action against the Board of Education of the San Juan School District (the "Board") and its members to compel the San Juan School District (the "District") to provide secondary school facilities and services at Navajo Mountain and to improve the quality of elementary education at Navajo Mountain.

Although Navajo Mountain is technically within Utah, the only vehicular access to the

---

1. Because of its geographical isolation, many of the Navajo Mountain people were able to avoid the infamous "Long Walk" of the Navajos by hiding in the area's rugged mountains and canyons. *See* Office of Indian Education Programs, Bureau of Indian Affairs, U.S. Department of the Interior, *Report on BIA Education: Excellence in Indian Education Through the Effective Schools Process* 39 (Final Review Draft, March 1988).

2. Not all Native Americans residing at Navajo Mountain are Navajos. Apparently some Paiute Indians also live on the Navajo reservation at Navajo Mountain. *See* Plaintiffs' Memo. at 4, ¶ 7.

Navajo Mountain area is from the Arizona side, by a graded dirt road. It is a 200–mile trip from District headquarters in Monticello, Utah, to Navajo Mountain. As the proverbial crow flies, Navajo Mountain is only about 45 miles from the District's nearest high school, at Monument Valley, and only about 60 miles from the District's nearest elementary school, at Mexican Hat, but because of the topography and lack of roads, one has to drive more than 120 miles from Navajo Mountain to reach the nearest District facilities.

This is not the first time this court has considered the question of the Board's alleged obligation to educate Native Americans in the District. In 1974, Native American students residing in San Juan County brought an action against District, county and state officials alleging that they had "pursued a longstanding pattern of deep-rooted racial discrimination" resulting in "unequal educational opportunities for Native American children attending the San Juan public schools." *See* Complaint for Injunctive and Declaratory Relief (Civil Rights), *Sinajini v. Board of Educ.*, No. C–74–346 (D.Utah), at 2, ¶ 1. (A copy of the *Sinajini* complaint is included as exhibit E to Defendants' Exhibits in Support of Motion for Summary Judgment (dkt. no. 61) [hereinafter Defendants' Exhibits].) The parties to that case entered into a consent decree requiring the District to construct secondary facilities in the Oljato–Monument Valley–Mexican Hat area and in the Montezuma Creek–Aneth–Red Mesa area and to "use its best efforts to provide an education program . . . at each of the new schools which is of substantially as

high quality as the existing secondary programs in the District." Agreement of Parties, *Sinajini v. Board of Educ.*, No. C–74–346, at 10, ¶ 17. (A copy of the consent decree is included as exhibit F to Defendants' Exhibits.)[3] The parties' agreement also required school officials to "consult with the school community group and with parents in the Navajo Mountain area to determine whether the residents of that area wish an elementary school in that area." Agreement of Parties, *Sinajini v. Board of Educ.*, No. C–74–346, at 14–15, ¶ 30. If the Navajo Mountain residents wanted an elementary school, then the District was required to establish one "at the earliest practicable date" unless "full elementary facilities serving at least grades kindergarten through six are established in that area by the Bureau of Indian Affairs [BIA]." *Id.* at 15, ¶ 30.

The District determined that the Navajo Mountain residents wanted an elementary school in their area but preferred a BIA boarding school to a District facility, so rather than constructing an elementary school itself, the District supported the residents' efforts to obtain a BIA facility at Navajo Mountain. *See* Defendants' Exhibits ex. G. Completed in 1983, the BIA school at Navajo Mountain now provides a free public education to students in grades K through 8. The school has about 115 students (well below its capacity of 200), some of whom board at the school. *See id.* exs. B, K & Q. However, there is no school at Navajo Mountain for students in grades 9 through 12. Secondary-school-age children at Navajo Mountain, of whom there are between about 40 and 66 on the Utah side,[4] must attend distant BIA

---

3. The plaintiffs in the *Sinajini* case reopened that action before this action was filed, alleging widespread violations of the injunction and consent decree entered in that case. They requested relief for the children at Navajo Mountain similar to the relief sought in this case. The court in *Sinajini* ruled that the plaintiffs' claim for a secondary school at Navajo Mountain went beyond the terms of the consent decree and injunction in that case and therefore struck the plaintiffs' allegations relating to a secondary school at Navajo Mountain, prompting this action. *See* Order Denying Plaintiffs' Motion to Modify the Consent Decree by Granting Defendants' Motions to Strike Portions of Plaintiffs' Verified Motions, *Sinajini v. Board of Educ.*, No. 74–C–346A (D.Utah November 29, 1993). (A copy of

the court's order in *Sinajini* is attached to the Memorandum of Points and Authorities in Support of Defendants['] Motion to Dismiss for Failure to Join an Indispensable Party (dkt. no. 10) as exhibit F.)

4. *Compare* Declaration of Larry Rogers (appendix 1 to plaintiffs' Memorandum in Support of Motion for Class Certification (dkt. no. 49) [hereinafter Class Certification Memo.]), ¶¶ 5 & 7 & ex. A (there are 49 children between the ages of 14 and 17 years in the Navajo Mountain chapter of the Navajo Nation, about two-thirds of whom live in Utah), *with* Second Affidavit of Jamie R. Holgate (appendix 2 to Class Certification Memo.), ¶ 8 (there are presently about 66 children of high-school age who reside in the Utah portion of the Navajo Mountain chapter).

boarding schools, reside in BIA dormitories near public schools or live with friends or relatives near public schools outside of Navajo Mountain. The District does not provide any educational services at Navajo Mountain.

The plaintiffs brought this action to compel the District to provide educational facilities and services at Navajo Mountain. The plaintiffs' first claim for relief alleges that, by failing to provide educational services at Navajo Mountain, the defendants have deliberately discriminated against the plaintiffs and members of their class based on race. The plaintiffs further claim that this discrimination violates the equal protection guarantees of the Fifth and Fourteenth Amendments to the United States Constitution and title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and its implementing regulations, 34 C.F.R. §§ 100.1 et seq., which prohibit racial discrimination in the operation of federally funded programs, as well as the injunction and consent decree in *Sinajini.* *See* Complaint for Injunctive and Declaratory Relief (Civil Rights) (dkt. no. 1) [hereinafter Complaint], at 11–12, ¶ 25. The plaintiffs' second claim alleges that the defendants have violated federal laws governing the use and expenditure of federal funds, including so-called chapter I funds, Johnson–O'Malley funds and Public Law 874 or federal impact funds. *See id.* at 12–13, ¶ 28.

The individual plaintiffs filed a motion to certify a class of plaintiffs consisting of all current and prospective Native American school-age children in the Navajo Mountain area, their parents and guardians, all adult students eligible for a free public education and all members of the Navajo tribe affected by the defendants' actions. *See* Motion for Class Certification (dkt. no. 48).

All the plaintiffs filed a motion for a preliminary injunction to enjoin the Board from refusing to provide Native American children at Navajo Mountain with an adequate secondary education and related school facilities and ordering the Board to submit a plan for providing a secondary education to each Native American of high-school age at Navajo Mountain comparable to that found in other schools in the District. *See* Joint Plaintiffs' Motion for a Preliminary Injunction (dkt. no. 46).

The defendants moved for summary judgment (dkt. no. 60), claiming that they had no duty to provide any educational services to Native American students residing at Navajo Mountain, and the plaintiffs filed a cross-motion for partial summary judgment on the issue of liability (dkt. no. 71). The United States filed a memorandum supporting and essentially tracking the plaintiffs' memoranda in support of their motion for partial summary judgment, and the Utah State Board of Education (the "State Board") filed a memorandum as amicus curiae setting forth its position.[5]

While the defendants' motion for summary judgment was pending, the parties stipulated to entry of an order providing that the District, with the aid of the State Board, would help secondary school students at Navajo Mountain and their parents with the increased expenses associated with living away from home while the students attend secondary schools in other areas (except for secondary schools operated by the BIA). *See* Stipulated Order Providing Preliminary Relief (dkt. no. 70), August 18, 1994, at 2–3. The plaintiffs' joint motion for a preliminary injunction was stayed during the defendants' performance of the terms of the stipulated order, but the plaintiffs were free to seek further relief following the expiration of the 1994–95 school year or at any other time following the court's disposition of the case on the merits. *See id.* at 2, ¶ 2.

While the parties' motions for summary judgment were pending, the United States sought and was granted leave to intervene in this action. It has filed a complaint-in-intervention alleging that the defendants have discriminated against the plaintiffs based on their race, in violation of the equal protection provisions of the United States and Utah

---

5. Under Utah law, the State Board has general control and supervision of the public school system within the state. *See* Utah Code Ann. § 53A–1–401(1) (Supp.1994). However, local school districts are controlled by local school boards, which are responsible for actually establishing, maintaining and managing the schools within a district. *See id.* §§ 53A–2–108 (1994) & 53A–3–402(2), (4), (14) & (17) (Supp.1994). The State Board cannot govern, manage or operate any school district or program unless authorized by statute. *Id.* § 53A–1–401(1) (Supp.1994).

constitutions, by failing to provide an equal educational opportunity for secondary-school-age residents of Navajo Mountain, including failing to provide a secondary school reasonably located to their place of residence. *See* Complaint–in–Intervention (dkt. no. 113), at 3–5. The Board has counterclaimed, alleging that the United States is responsible for the education of Native Americans at Navajo Mountain. *See* Answer to Complaint–in–Intervention and Counterclaim (dkt. no. 114), at 7, ¶ 4. The complaint-in-intervention is not presently before the court, although it raises some of the same issues as the parties' cross-motions for summary judgment.

After oral argument, the court took under advisement both motions for summary judgment, as well as the plaintiffs' motion to certify a class.[6] The court now enters this memorandum decision and order denying the parties' motions for summary judgment and denying the plaintiffs' motion for class certification.

## II.

## THE SUMMARY JUDGMENT MOTIONS

The threshold issue in this case is also the central issue, namely, whether the District has any legal duty to provide educational services to Native Americans residing on the Navajo reservation at Navajo Mountain. All sides agree that this issue is ripe for summary judgment, but they disagree about the existence and scope of any such duty.

Ironically, despite the fact that both maintain and operate schools on the reservation, both the District and the United States deny that they have any legal obligation to educate Native Americans living on the reservation. The District claims that any duty to provide education on the reservation (particularly, at Navajo Mountain) belongs to the United States and the Navajo Nation. The plaintiffs claim that the District has an absolute duty to educate Native Americans living within its boundaries, including those living at Navajo Mountain, and that that duty is not diminished by any corresponding duty the federal or tribal government may have. The United

States agrees that the District has a duty to educate the children of Navajo Mountain but denies that either the United States or the Navajo Nation has any responsibility for educating Native Americans; according to the United States, the District's duty is not only absolute but also exclusive. Finally, the State Board recognizes some obligation to provide an education to Navajo students living in Utah, whether on or off the reservation, but argues that the duty to educate the children of Navajo Mountain is not the absolute or exclusive responsibility of the State of Utah—it is a shared responsibility of the state and District, the United States (through the BIA) and the Navajo Nation. The court agrees with the State Board.

### A. *Avoidance of Constitutional Issues*

As a preliminary matter, the District suggests that the court does not have to reach the difficult constitutional issues involved in this case because whatever duty the District might otherwise have to educate Native American children residing at Navajo Mountain has been excused by the federal government's provision of educational services at Navajo Mountain. The plaintiffs argue that the existence of the BIA school at Navajo Mountain does not excuse the District from its obligation to educate the children of Navajo Mountain.

Courts have held that the existence of a BIA school does not justify the exclusion of Indian children from public schools. *See Piper v. Big Pine School Dist.*, 193 Cal. 664, 226 P. 926, 930 (1924); *Grant v. Michaels*, 94 Mont. 452, 23 P.2d 266, 272 (1933).

In *Grant*, the Montana Supreme Court stated that an Indian boarding school established by the federal government "does not fill the place of the free common school required by" the Montana Constitution and the fact "that such a school is open to the children of the ... district, does not relieve the state of its duty to furnish public school facilities to those children." 23 P.2d at 272.

---

6. The minute entry from the hearing on the parties' summary judgment motions indicates that the court also took the plaintiffs' motion for preliminary injunction under advisement. *See* dkt. no. 112. However, that motion had already been stayed by the court's order of August 18, 1994 (dkt. no. 70), and was not argued at the hearing.

*Grant* relied in part on *Piper,* in which the California Supreme Court held that a public school district could not refuse to admit an Indian student even though the student could have attended an Indian school within the territorial boundaries of the district. The court rejected the district's argument that the state constitutional requirement of a system of free common schools was satisfied by the establishment of a federal school:

> To argue that petitioner [a fifteen-year-old Indian] is eligible to attend a school which may perchance exist in the district, but over which the state has no control, is to beg the question. However efficiently or inefficiently such a school may be conducted would be no concern of the state.

226 P. at 930. The court concluded that, by denying the student admission to its schools, the district had deprived her of her right under the state constitution "to attend schools supported at the state's expense." *Id.*

Neither *Grant* nor *Piper* is controlling. The issue in *Grant* was whether the board of county commissioners had abused its discretion in overturning the decision of the county superintendent of schools to create a new school district. There was no evidence of any government boarding school in the area. 23 P.2d at 271. Thus, the language quoted above was merely dicta. The issue in *Piper* was whether the district could prevent a non-reservation Indian from attending an existing school, not whether the district had to build a school for her to attend. Neither *Grant* nor *Piper* involved a district's alleged duty to build a school in a remote area of an Indian reservation, and each relied on a unique provision of its state's constitution. Perhaps most important, in neither *Grant* nor *Piper* did the plaintiffs choose to have a federally operated school rather than a state or dis-

trict school in their area, as the plaintiffs in this case did.

The court need not decide at this time whether the presence of the BIA school at Navajo Mountain excuses any duty the District may have to provide educational services at Navajo Mountain. It is undisputed that the only educational services the federal government provides at Navajo Mountain are through the BIA school, which only has classes for grades K through 8. The federal government does not provide any secondary-school services at Navajo Mountain. Native American children wishing to continue their studies beyond the eighth grade must go elsewhere for an education. While the BIA may provide a secondary education at one of its boarding schools or may help subsidize a secondary education elsewhere, the court cannot say, as a matter of law, that by providing for an education at a remote facility the BIA has fulfilled whatever obligation the parties may have to provide a free public education to the plaintiffs that is equivalent to that received by other students in the District. Requiring a minor student to leave home for an education does not necessarily provide him or her with an equivalent education.[7] *Cf. Prince v. Board of Educ.,* 88 N.M. 548, 543 P.2d 1176, 1184 (1975) (if school children cannot "make the trip to school and back home each day, then they would be denied a free school just as effectively as if no school existed") (quoting *Strawn v. Russell,* 54 N.M. 221, 219 P.2d 292 (1950)). In fact, evidence in this case suggests that secondary students at Navajo Mountain are disadvantaged by having to go to boarding schools. *See, e.g.,* Affidavit of Jamie R. Holgate at 4; Second Affidavit of Jamie Holgate ¶ 7; Affidavit of Doris Bedonie ¶¶ 3-4; Affidavit of Henry Smallcanyon

---

7. In passing the Indian Child Welfare Act, 25 U.S.C.A. §§ 1901–63 (1983), Congress recognized the disruptive effect Indian boarding schools have had on Indian family life. *See* 25 U.S.C.A. § 1961(a) ("It is the sense of Congress that the absence of locally convenient day schools may contribute to the breakup of Indian families"); H.R.Rep. No. 1386, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7531 ("Federal boarding school and dormitory programs also contribute to the destruction of Indian family and community life"). It is not unreasonable to conclude that this disruptive in-

fluence has a detrimental effect on the education of secondary students away from home. In fact, Congress has made express findings that federal assistance of Indian education "has not effected the desired level of educational achievement" among Indian children and that "parental and community control of the educational process is of crucial importance to the Indian people." 25 U.S.C.A. § 450(b)(2) & (3). Utah has also recognized the importance of parental participation in education. *See* Utah Code Ann. § 53A–1a–105 (1994).

¶ 3; Affidavit of Laura Tallman ¶ 3; Affidavit of Mary N. Greymountain ¶ 3; Affidavit of Stewart Clark ¶ 3.[8] Thus, at a minimum the District may still have some duty to provide an education to Navajo Mountain children in grades 9 through 12.

## B. *Justiciability*

 The District also suggests that this court does not have jurisdiction to decide this case because it presents a nonjusticiable political question. The political question doctrine holds that certain matters are not appropriate for judicial consideration but "are really political in nature and best resolved by the body politic." 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 2.16(a) at 275 (2d ed. 1992). *See also Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (stating the test for determining whether a case presents a political question).

 The gist of the plaintiffs' complaint is that the defendants have discriminated against the plaintiffs by failing to provide them with educational opportunities equal to those provided other children in the District. That claim does not present a nonjusticiable political question but is the sort of claim courts in this country have been dealing with ever since *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Courts have both the power and the respon-

sibility to address alleged violations of constitutional rights, such as the right to equal protection claimed in this case. *See, e.g., Baker v. Carr,* 369 U.S. at 209–10, 82 S.Ct. at 705–06. "[I]f 'discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights.'" *Id.* (quoting *Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944)).

*National Indian Youth Council v. Bruce,* 366 F.Supp. 313 (D.Utah), *aff'd,* 485 F.2d 97 (10th Cir.1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), the only case the District relies on for its argument, is not controlling. The plaintiffs in that case were trying to force a federal agency (the BIA) to close the Intermountain Indian School at Brigham City, Utah, and transfer its secondary education programs to a suitable facility on the Navajo reservation. The court concluded that it was "powerless to adjudicate" any claim seeking removal of the school since Congress had exclusive authority "to control and manage the affairs of the Indian people." 366 F.Supp. at 319, 320.[9]

 *Bruce* involved a coordinate branch of the federal government and thus came squarely within the political question doctrine. *See Baker,* 369 U.S. at 210, 82 S.Ct. at 706 ("it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal

**8.** The first Affidavit of Jamie R. Holgate was filed in the *Sinajini* case. A copy of it was attached as appendix 6 to the plaintiffs' Class Certification Memo. The other affidavits cited were attached as appendices to the Joint Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction (dkt. no. 48).

**9.** The court in *Bruce* first held that the plaintiffs' claim was barred by sovereign immunity, that operation of the BIA school was contemplated by statute and committed to the discretion of the Department of the Interior and that there was no evidence that the Department had exceeded its discretion. 366 F.Supp. at 317–18. The court then held that the plaintiffs' proper remedy was administrative and that the plaintiffs had failed to exhaust their administrative remedy. *Id.* at 319. The court then stated that, even if the plaintiffs' failure to exhaust their administrative remedy could be excused as futile, "there is a further, overarching limitation on judicial action which *may,* in any event, render this court pow-

erless to adjudicate plaintiffs'" claims, namely, the political question doctrine. *Id.* (emphasis added). The court based its conclusion that the case presented a political question on Supreme Court precedent holding that the "status" of Indians is a nonjusticiable political question. *See id.* at 320 & nn. 26 & 27. The court construed "status" to include "the manner in which education is provided for the Indians." *Id.* at 320. The court's construction of "status" is questionable. *Cf. Baker,* 369 U.S. at 215, 82 S.Ct. at 709 (suggesting that the "status" of Indians refers to the question of "whether Indians are recognized as a tribe"). Subsequent Supreme Court decisions have rejected the idea that any litigation involving Indian affairs "necessarily entails nonjusticiable political questions." *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 249, 105 S.Ct. 1245, 1259, 84 L.Ed.2d 169 (1985), and cases cited therein. This court need not decide, however, whether it would follow *Bruce*'s reasoning since *Bruce* is distinguishable on its facts.

judiciary's relationship to the States, which gives rise to the 'political question'"). By contrast, this case involves the duty of a state or local school board to educate Indian children. The question of duty is, of course, a legal question, *see, e.g., Utah Power & Light Co. v. Federal Ins. Co.*, 983 F.2d 1549, 1562 (10th Cir.1993); *Ferree v. State*, 784 P.2d 149, 151 (Utah 1989), and "[i]t is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). The court must therefore determine what duty, if any, the District has to educate the plaintiff children.

## C. *The District's Duty to Educate Children Residing at Navajo Mountain*

The asserted source of the District's duty to educate the children of Navajo Mountain is state law. *Cf. Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982) ("Public education is not a 'right' granted to individuals by the [federal] Constitution"); *Piper v. Big Pine Sch. Dist.*, 193 Cal. 664, 226 P. 926, 928 (1924) (the "privilege of receiving an education at the expense of the state" is "distinctly a state affair," since the "federal Constitution does not provide for any general system of education"). Congress required as a condition for Utah's admission into the Union that Utah's constitutional convention provide for "the establishment and maintenance of a system of public schools, which shall be open to all the children of [the] State and free from sectarian control." Act of July 16, 1894, ch. 138, § 3, fourth, 28 Stat. 107, 108 (1893–95). Accordingly, Utah's constitution required the legislature to provide for "the establishment and maintenance of the state's education systems including ... a public education system, which shall be open to all children of the state...." Utah Const. art. X, § 1. *See also id.* art. III, fourth (irrevocable ordinance requiring the legislature to "make laws for the establishment and maintenance of a system of public schools, which shall be open to

all the children of the State and be free from sectarian control"). Pursuant to its constitutional obligation, the Utah Legislature has provided for a system of public education that "recognizes that all children of the state are entitled to reasonably equal educational opportunities regardless of their place of residence in the state and of the economic situation of their respective school districts." Utah Code Ann. § 53A–17a–102(1) (1994). The state system is meant "to provide a minimum school program for the state in accordance with the constitutional mandate." *Id.*

■ The District claims that when the framers of the Utah Constitution referred to "all children of the state" they did not mean Indian children living on a reservation. The District bases this argument in part on a provision of the Enabling Act requiring the state constitution to "make no distinction in civil or political rights on account of race or color, *except as to Indians not taxed ...*."[10] Act of July 16, 1894, ch. 138, § 3, 28 Stat. at 108 (emphasis added). Although the State may have been authorized to distinguish "Indians not taxed" from other groups, the constitution actually adopted did not expressly exclude Native American children from its guarantee of a public education system "open to all children of the state."

■ The District argues that, in construing the phrase "all children of the State," the court must consider how the phrase has been applied in the past and that, until relatively recently, on-reservation Native Americans were not provided with any type of free, public education from the State. The simple answer to the District's argument is that, however the State may have interpreted and applied its constitution in the past, it now recognizes some duty under the Enabling Act and the constitution to educate on-reservation Indian children. *See* Memorandum Setting Forth Utah State Board of Education's Position as Amicus Curiae on Education on the Navajo Reservation Within

---

**10.** The District construes the phrase "Indians not taxed" to mean Indians living on the reservation, since the Enabling Act apparently prohibited the State from taxing reservation land. *See* Act of July 16, 1894, ch. 138, § 3, second, 28 Stat. at 108. *See also Elk v. Wilkins*, 112 U.S. 94, 102, 5 S.Ct. 41, 45 (1884) (holding that the Fourteenth Amendment, which makes persons born in the United States and subject to its jurisdiction citizens of the United States and requires that representatives be apportioned among the states based on population "excluding Indians not taxed," did not make an Indian a citizen of the United States).

Utah (dkt. no. 109), at 19–20. In any event, prior practice is not conclusive. *See, e.g., Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 669, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1966); *Brown v. Board of Educ.,* 347 U.S. 483, 489–93, 74 S.Ct. 686, 688–91, 98 L.Ed. 873 (1954). Constitutions are necessarily framed in generalities. *See, e.g., Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 326, 4 L.Ed. 97 (1816). They must be flexible enough to deal with new conditions and changing mores.

> [A]s changes come in social and political life [the Constitution] embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words, while the powers granted do not change, they apply from generation to generation to all things to which they are in their nature applicable.

*South Carolina v. United States,* 199 U.S. 437, 448–49, 26 S.Ct. 110, 111, 50 L.Ed. 261 (1905). *See also American Fork City v. Crosgrove,* 701 P.2d 1069, 1073 (Utah 1985) (per Durham, J.) (the scope of guarantees under the Utah Constitution "is not limited by their historical roots"). Whatever may have been the status of Native Americans in 1895, when the Utah Constitution was adopted, it is now clear that Native Americans residing on a reservation within the territorial confines of a state are citizens of that state and entitled to all the rights and privileges of other citizens. *See* U.S. Const. amend. XIV, § 1 (all persons born in the United States and subject to its jurisdiction are citizens of the United States and of the state wherein they reside); 8 U.S.C.A. § 1401(b) (Supp.1994) (persons born in the United States to a member of an Indian tribe are nationals and citizens of the United States); *Goodluck v. Apache County,* 417 F.Supp. 13, 16 (D.Ariz.1975), (the Fourteenth Amendment and 8 U.S.C. § 1401(b) grant national and state citizenship to reservation Indians), *aff'd mem. sub nom. Apache County v. United States,* 429 U.S. 876, 97 S.Ct. .225, 50 L.Ed.2d 160 (1976); *Felix S. Cohen's Handbook of Federal Indian Law* 639–40, 645, 649 (Rennard Strickland et al. eds., 1982) [hereinafter *Cohen* ].

■■■ The District argues that its lack of power on the reservation counsels against finding any duty on its part to provide educational services on the reservation. For example, the District cannot condemn reservation property to acquire the land to build a school, *see* Utah Const. art. III, second (disclaiming all rights to Indian lands within state boundaries); *People v. Naegele Outdoor Advertising Co.,* 38 Cal.3d 509, 698 P.2d 150, 156 (1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986); cannot enforce its compulsory attendance laws on the reservation without the consent of the tribe, *see* 25 U.S.C.A. § 231 (1983); [11] and cannot appropriate water from the reservation for school use. While these limitations on the District's powers may affect the scope of the District's duty and may require the cooperation of the Navajo Nation and the United States in providing educational services to Navajo children living on the reservation, they do not excuse altogether the District's constitutional obligation to provide a system of public schools open to all the children of the District, including the children of Navajo Mountain.[12] The Navajo Na-

11. Section 231 states that the Secretary of the Interior may permit state agents to enter on Indian reservations for the purpose of enforcing certain state laws affecting health and education, including "State compulsory school attendance laws," but requires "a resolution consenting to such application" from the duly constituted governing body of the tribe, where one exists. The Navajo Tribal Council has consented to the application of state compulsory school attendance laws to the members of the Navajo tribe and their enforcement on the Navajo reservation. *See* Navajo Tribal Code tit. 10, § 503 (Supp. 1984–85). When the Navajos entered into a treaty with the United States, they promised "to compel their children, male and female, between the ages of six and sixteen years, to attend school." *See* Treaty, June 1, 1868, U.S.–Navajo Tribe, art. VI, 15 Stat. 667, 669 (1868). Navajo law now makes school attendance compulsory for all Navajo children between the ages of five and eighteen. *See* Navajo Tribal Code tit. 10, §§ 118 & 502.

12. This conclusion is consistent with that of the Solicitor of the Department of the Interior Relating to Indian Affairs. The Solicitor has opined that Indian residents of a state are entitled to all of the benefits the state offers with respect to education and that "the State is not only authorized but may not deny the same privileges to Indians that are granted to other residents of the State." *See* Memorandum, May 1, 1955, in 2 U.S. Dep't of the Interior, *Opinions of the Solici-*

tion has expressed its willingness to make land available for public education. *See* Navajo Tribal Code tit. 10, §§ 1201(a) (authorizing the Advisory Committee of the Tribal Council "to withdraw Tribal land and issue leases and permits for the use of such land for school or other legitimate educational purposes") & 1202(a) (providing that such land shall be rent-free) (1978). At least one other court has concluded that state schools on reservation land can effectively fulfill their educational responsibilities under the state constitution. *See Prince v. Board of Educ.,* 88 N.M. 548, 543 P.2d 1176, 1182–83 (1975).

Finally, the District argues that, even if it otherwise would have some duty to educate Native American children at Navajo Mountain under state law, that duty has been preempted by the comprehensive scheme the United States has implemented for educating on-reservation Navajos, making application of Utah's education clause to on-reservation Indians "unnecessary." This argument requires the court to determine first what responsibility, if any, the United States has for Navajo education.

D. *The United States' Duty to Educate Children Residing at Navajo Mountain*

 The plenary power of Congress in Indian affairs is well established. *See, e.g., Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *National Indian Youth Council, Intermountain Indian Sch. Ch. v. Bruce,* 485 F.2d 97, 99 (10th Cir.1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). The federal government's involvement in Navajo education dates back to 1868, the year of the treaty between the United States and the Navajos.[13] That treaty provided in part as follows:

> In order to insure the civilization of the Indians entering into this treaty, the necessity of education is admitted ...; and the United States agrees that, for every thirty children between [the ages of six and sixteen] who can be induced or compelled to attend school, a house shall be provided, and a teacher competent to teach the elementary branches of an English

education shall be furnished, who will reside among said Indians, and faithfully discharge his or her duties as a teacher.

> The provisions of this article to continue for not less than ten years.

Treaty, June 1, 1868, U.S.–Navajo Tribe, art. VI, 15 Stat. 667, 669 (1867–69).

Relying on *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 624 F.2d 981 (1980), the United States claims that the treaty imposes no present duty on it to provide education to Navajos. Response of the United States to the Outstanding Motions for Summary Judgment Filed by Plaintiffs and Defendants (dkt. no. 110) [hereinafter United States' Memo.], at 22–23. *Navajo Tribe* was an accounting action under the Indian Claims Commission Act, 25 U.S.C. §§ 70–70w. The tribe sought an accounting of certain expenditures for education. The trial court held that the United States' obligation under the 1868 treaty to provide education for Navajos lasted for no more than ten years. Even though it was "not necessary to consider" this ruling, since the expenditures at issue could stand regardless of the treaty, the Court of Claims affirmed. *See* 624 F.2d at 995, 996. The court agreed with the trial judge that, "in the absence of very strong materials suggesting the contrary, the second paragraph [of article VI of the Navajo treaty] must be taken literally to mean that the defendant's obligations under the Article were not to continue for more than 10 years." *Id.*

*Navajo Tribe* is dubious authority at best, based, as it is, on a "literal" reading of the treaty that gives it a meaning just the opposite of its plain language. The treaty "mean[s] what it says in words," *see id.,* and the words "not less than ten years" do not mean "not more than ten years," as the Court of Claims seemed to think. They mean that the federal government will provide the services required for *at least* ten years, not for *only* ten years. In other words, they establish a floor, not a ceiling.

The Court of Claims also relied on the fact that Congress made ten appropriations for

---

*tor of the Department of the Interior Relating to Indian Affairs, 1917–74* 1666, 1666.

**13.** For a history of federal involvement in Indian education generally, see *Cohen* at 678–96.

Navajo education between 1871 and 1880, the last of which said it was the "last of ten installments" per article VI of the 1868 treaty, and there were no further appropriations expressly for Navajo education until 1913.[14] Rather than proving the Court of Claims' construction of the statute, the fact that Congress made an appropriation in 1880—twelve years after the treaty—shows that article VI meant what it said, namely, that the United States' obligation to provide educational opportunities to the Navajos could continue for more than ten years after the treaty. Between 1913 and 1928, Congress appropriated over $1.5 million for Navajo education. *See* 624 F.2d at 992 & n. 20. These appropriations expressly provided that they were to carry out article VI of the 1868 treaty. *See id.* n. 20 & 996.

 The Court of Claims dismissed these later appropriations as evidence of the United States' continuing obligation under article VI on two grounds: (1) because they occurred well after the treaty, and (2) because the tribe did not cite any legislative history for the appropriations "spelling out clearly that Article VI was intended to last indefinitely or until the educational goal was fully achieved." *Id.* at 996. The first objection could also be made to the evidence the Court of Claims relied on—the 1880 appropriation, which was made some twelve years after the treaty. In any event, remoteness in time is not dispositive. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969) (statements of a later Congress about the intent of an earlier Congress are entitled to great weight); *Talley v. Mathews,* 550 F.2d 911, 920 & n. 22 (4th Cir.1977) (accord). There could be any number of reasons for the lack of appropriations specific to the 1868 treaty between 1880 and 1913, not least of which may have been shifts in federal policy, such as the shift away from treaty-making

and towards assimilation. *See generally Cohen* ch. 2, § C. As to the second objection, the absence of any statement in the legislative history cannot overcome the express language of the legislation itself. The appropriations between 1913 and 1928 stated that they were for the purpose of carrying out article VI of the 1868 treaty, *see, e.g.,* Act of June 30, 1913, ch. 4, § 2, 38 Stat. 77, 86 (1913–15), showing that Congress recognized a continuing obligation under the treaty to provide educational services to the Navajos. Moreover, the Court of Claims' reliance on the alleged lack of legislative history runs counter to established canons of construction, under which Indian treaties are to be construed liberally in favor of the Indians and under which treaty rights generally cannot be abrogated absent "explicit statutory language." *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985) (citation omitted). Thus, although "Congress holds the constitutional power to abrogate treaty provisions relating to the provision of services," *Cohen* 674 n. 11, it is not at all clear that Congress has done so with respect to Navajo education.[15] In fact, as recently as 1950 Congress appropriated another $25,-000,000 for "[s]chool buildings and equipment, and other education measures" "[i]n order to further the purposes of existing treaties with the Navajo Indians." Navajo and Hopi Tribes Rehabilitation Act, Pub.L. No. 81–474, § 1, 64 Stat. 44, 45, 44 (1950) (codified at 25 U.S.C.A. § 631). For all of these reasons, the court concludes that the dicta in *Navajo Nation* to the effect that the United States' obligation under the 1868 treaty to provide education for the Navajos lasted no more than ten years does not relieve the United States of its treaty obligation.

 The 1868 treaty is not the only source of the United States' obligation to

---

14. That does not necessarily mean that the Navajos received no federal monies for education between 1880 and 1913. During that period, Congress made "miscellaneous" appropriations of money for "support and civilization of the Navajo Indians, including pay of employees," *see, e.g.,* Act of July 13, 1892, ch. 164, 27 Stat. 120, 135 (1892), as well as appropriations for specific Indian schools, *see, e.g., id.,* 27 Stat. at 140–43.

15. If Congress has the power unilaterally to abrogate treaty provisions relating to the provision of services, then arguably it has the power to reinstate treaty provisions relating to the provision of services and could be deemed to have done so by its resumption in 1913 of appropriations under the 1868 treaty, even if it had previously thought it had satisfied its obligation under article VI.

educate Navajos. Federal statutes and regulations also recognize the federal government's responsibility in the area of Indian education. For example, Congress has expressly declared

> that a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being.

25 U.S.C.A. § 450a(c) (1983). *See also id.* § 450a(a) (recognizing education as a "Federal service[ ] to Indian communities"); *id.* § 2502(c) (Supp.1994) (declaring it a "major national goal" to "provide the resources, processes, and structures which will enable tribes and local communities to effect the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel" in life). Through numerous statutes, Congress has established federal standards for and support of Indian education. *See, e.g.,* 25 U.S.C.A. §§ 2001–2022b (1983 & Supp.1994). *See generally Ramah Navajo Sch. Bd. v. Bureau of Revenue,* 458 U.S. 832, 839–40, 102 S.Ct. 3394, 3399–3400, 73 L.Ed.2d 1174 (1982), and statutes cited therein. BIA regulations ex-

pressly recognize that "it is the responsibility and goal of the Federal government to provide comprehensive education programs and services for Indians...." 25 C.F.R. § 32.3 (1994). Indeed, the BIA's mission statement in the area of education states, "The mission of the Bureau of Indian Affairs, Office of Indian Education Programs, is to provide quality education opportunities from early childhood through life...." *Id.* In fact, the Department of the Interior has committed to "[p]rovide day and residential educational services as close to an Indian ... student's home as possible, except when a student elects to attend a school elsewhere...." *Id.* § 32.4(p).

Whether the federal government's responsibility for Indian education is based on a legal obligation arising out of its trust relationship with Indian peoples,[16] or a moral obligation that it has voluntarily assumed, *compare, e.g.,* 25 U.S.C.A. §§ 450(a) & 2501 (concluding from its "careful review of the Federal government's historical and special legal relationship with" American Indians that the United States has "resulting responsibilities to" Indians, particularly in the area of education),[17] *and* 25 C.F.R. § 32.3 ("the Federal Government has a direct interest, *as trustee,* in protecting Indian ... children, including their education") (emphasis added),

**16.** Commentators have recognized that "a persuasive argument can be made" that the United States' trust obligation toward Indians includes a duty to provide education, but so far no court has so held. *See* Reid Peyton Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians,* 27 Stan.L.Rev. 1213, 1245 (1975). *See also* Daniel M. Rosenfelt, *Indian Schools and Community Control,* 25 Stan.L.Rev. 489, 503–04 (1973).

Over the years, Congress has apparently thought that the United States' trust responsibility toward Indians included educational assistance. *See, e.g.,* Letter from Congressman Howard to President Roosevelt, *reprinted in* H.R.Rep. No. 1804, 73d Cong., 2d Sess. 8 (1934), *and quoted in Morton v. Mancari,* 417 U.S. 535, 542 n. 10, 94 S.Ct. 2474, 2478 n. 10, 41 L.Ed.2d 290 (1974). Congress expressly so provided in certain legislation enacted in 1982. *See* S. 2623, 97th Cong., 2d Sess. § 2 (1982); H.R. 7336, 97th Cong., 2d Sess. § 17 (1982); H.R.Rep. No. 977, 97th Cong., 2d Sess. 7, 8 (1982). President Reagan withheld his approval of those bills in part because Congress's declaration that the provision of education to Indian students was part of the United States' trust responsibility "would poten-

tially create legal obligations and entitlements that are not clearly intended or understood." *See* Memorandum of Disapproval of H.R. 7336, 12 Jan. 1983, 19 Weekly Compilation of Presidential Documents 38 (1983). Although a bill that suffers a pocket veto is not authoritative, it is at least some indication of congressional intent. *See Feldpausch v. Heckler,* 763 F.2d 229, 232–33 (6th Cir.1985) (the legislative history of a bill that was vetoed is still instructive on the issue of congressional intent) (citing *Clifton v. Heckler,* 755 F.2d 1138, 1145 n. 15 (5th Cir.1985)). These bills show that Congress, the body vested with "plenary power" in Indian affairs, viewed Indian education as part of the United States' trust responsibility.

**17.** Assuming that the federal government's "legal relationship" with Native Americans was "roughly equivalent" to "trust responsibility," one court found similar congressional findings and statement of policy with respect to Indian health care to be "the latest statement of what the [United States'] trust responsibility requires in the area of health care." *See White v. Califano,* 437 F.Supp. 543, 557 & n. 9, 554 (D.S.D. 1977), *aff'd,* 581 F.2d 697 (8th Cir.1978).

*with* 25 U.S.C.A. § 1901 (recognizing "the Federal responsibility to Indian people" and finding that Congress "has assumed the responsibility for the protection and preservation of Indian tribes and their resources," none of which is "more vital … than their children"), the United States clearly has an obligation for educating the plaintiffs in this case. *Cf. White v. Califano,* 437 F.Supp. at 554–57 (federal Indian health legislation established the existence of the United States' duty to provide mental health care for indigent Indians). The United States' protestations to the contrary, *see* United States' Memo. at 19–22, are simply incredible.[18]

### E. *Preemption*

The District argues that the United States' obligation to educate the plaintiffs preempts its own obligation. The District's duty is not preempted by federal law.

#### 1. *The Applicable Preemption Standard*

██ As an initial matter, the District claims that the proper standard for considering its preemption claim is the broad standard generally applicable to Indian law. Under that standard, express congressional statements of preemption are "unnecessary," and "ambiguities in federal law are resolved in favor of preemption." *White Mountain*

*Apache Tribe v. Arizona,* 649 F.2d 1274, 1278 (9th Cir.1981) (citing *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 140, 100 S.Ct. 2578, 2582, 65 L.Ed.2d 665 (1980)). *See also Bracker,* 448 U.S. at 143, 100 S.Ct. at 2583 ("The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law"). This broad standard was adopted out of respect for the "tradition of Indian sovereignty over the reservation and tribal members" and applies where state law regulates on-reservation conduct. *See Bracker,* 448 U.S. at 143–44, 100 S.Ct. at 2583–84. *See also Richardson v. Mt. Adams Furniture (In re Greene),* 980 F.2d 590, 595 (9th Cir.1992) ("Almost by definition, application of the preemption analysis is limited to situations where the state itself is seeking to tax or regulate conduct on the reservation").[19] *See generally Cohen* at 272–79. This case does not involve state taxation or regulation of conduct but the provision of a governmental benefit or service—education. It would be ironic—not to mention contrary to Congress's intent and trust obligation—to apply a doctrine that was meant to benefit Indian tribes, by protecting their sovereignty, to deprive them of a badly needed service.[20]

---

**18.** One authority has suggested that Congress's trust obligation to provide services "is essentially a moral one and is legally unenforceable against Congress." *Cohen* at 677. *Cohen* goes on to say, however, that "[e]xisting statutory programs are so extensive that it is often appropriate to assume that a general duty to provide services has been undertaken…." *Id.* at 677–78. The court need not decide whether Congress could lawfully cut off all services to Indians altogether since Congress has so far not seen fit to do so. As long as federal statutes and regulations recognizing a federal obligation for Indian education are in force, the United States has such an obligation, regardless of whether any obligation could be enforced absent the statutes and regulations.

**19.** Both *White Mountain Apache* cases the District relies on for its statement of the Indian law preemption standard involved state regulation of non-Indians on reservations. *Bracker* involved regulation of a non-Indian entity's timber operations, and *Arizona* involved regulation of hunting and fishing by non-Indians on reservations. *Bracker* relied on three factors in holding that a state tax on reservation logging operations was preempted: (1) the pervasiveness of a federal regulatory scheme, which precluded the "addi-

tional burdens" sought to be imposed, (2) the negative impact the assessment of state taxes would have on federal policies, and (3) the lack of any state service or function that would justify the assessment. 448 U.S. at 148–49, 100 S.Ct. at 2586. (*Arizona* applied the same three factors. *See* 649 F.2d at 1279.) Obviously, these factors do not apply in a case such as this involving the provision of educational services. The provision of such services does not impose any "additional burden" on those on the reservation but benefits them. It does not interfere with but is in accordance with federal policy, which is to see that Indians receive proper education. And it is justified by the benefits the state receives from a better-educated populace.

**20.** *White v. Califano,* 437 F.Supp. 543 (D.S.D. 1977), *aff'd,* 581 F.2d 697 (8th Cir.1978), the only case the parties have cited applying preemption to the provision of social services, recognized that preemption typically arises "when federal regulatory activity conflicts with a state's attempts to regulate a given area of activity" and that "the term 'preemption' itself may be inappropriate" in the area of social services. 437 F.Supp. at 558.

The court therefore concludes that the broad standard of Indian law preemption does not apply.[21] This case can be decided on general preemption principles.

### 2. The Compatibility of State and Federal Law

■ "[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent." *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985). The District has not pointed to any statute or rule expressly preempting state law in the area of Indian education. State law may still be preempted, however, where

> the scheme of federal regulation is " 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' " ... [or] where "compliance with both federal and state regulations is a physical impossibility," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 100, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992) (per O'Connor, J.) (citations omitted). The ultimate test is whether state law in the area is "consistent with the structure and purpose" of federal law as a whole. *Id. See also Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 483, 96 S.Ct. 1634, 1646, 48 L.Ed.2d 96 (1976) (federal laws "passed to protect and guard [Indians] only affect the operation, within the [reservation], of such state laws as conflict with the federal enactments") (quoting *United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938)); *Cohen* at 271 (preemption generally is meant to prevent states from thwarting Congress's legislative purposes). Courts are less inclined to find federal programs preemptive of state programs in areas traditionally left to the states, such as education. *See Cohen* at 272 & n. 12 & cases cited therein. *See also* 20 U.S.C.A. § 3401(4) ("in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States").

■ Here, there is no conflict between state and federal law. In fact, federal law has shifted away from federal education of Native Americans towards state, local and tribal education: "Over the years, responsibility for Indian education has shifted from the Bureau of Indian Affairs [BIA] to state and tribal governments operating with financial assistance from BIA and Department of Education programs." *Cohen* at 678. The "comprehensive federal scheme" the District relies on for its preemption argument now depends to a large extent on federal assistance to state and local educational programs to educate Native Americans.[22] The Federally Impacted Aid Act, Public Law 81–874 (codified as amended at 20 U.S.C.A. §§ 236–40), makes federal impact funds available to local educational agencies for educating residents of Indian lands. *See* 20 U.S.C.A. §§ 236, 238, 240(b). The School Facilities Construction Act, Public Law 81–815 (codified as amended at 20 U.S.C.A. §§ 631–47), makes federal funds available to local educational agencies for the construction of schools to "provide free public education for children who reside on Indian lands." 20 U.S.C.A. § 644(a). Title I of the Elementary and Secondary Education Act of 1965, now referred to as chapter I (codified as amended and reorganized at 20 U.S.C.A. §§ 2701–2976), provides financial assistance to local educational agencies for the education of Indian children. *See* 20 U.S.C.A. §§ 2701 & 2711. The Johnson–O'Malley Act of 1934

---

**21.** Even under the unique Indian-law preemption standard, the court believes that preemption would not apply. The Indian law cases "have applied a flexible pre-emption analysis sensitive to the particular facts and legislation involved" and have turned on " 'a particularized examination of the relevant state, federal, and tribal interests.' " *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 176, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989) (quoting *Ramah Navajo Sch. Bd. v. Bureau of Revenue,* 458 U.S. 832, 838, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982)). As discussed more fully below, the federal legislation involved in this case does not preclude but expressly provides for state involvement in Indian education, and the interests of the state, federal and tribal governments involved are identical, namely, the interest in a well-educated citizenry.

**22.** Federal financial assistance to local school districts for Indian education began as early as 1890. *See Cohen* at 684.

'(codified as reenacted and amended at 25 U.S.C. §§ 452–57) authorizes the Secretary of the Interior to contract with and provide assistance to state education agencies and school districts for Indian education. *See* 25 U.S.C.A. §§ 452–458e. The Indian Education Act (codified as amended at 25 U.S.C.A. §§ 2601–51) also provides financial assistance to local educational agencies for the education of Indian children. Indeed, in that last act, Congress expressly declared it to be "the policy of the United States to provide financial assistance to local educational agencies to develop and carry out elementary and secondary school programs specially designed to meet [the] special education and culturally related academic needs" of Indian children. 25 U.S.C.A. § 2601.[23] *See also* 20 U.S.C.A. § 2701(a) (chapter I) (declaring it the policy of the United States to "provide financial assistance to State and local educational agencies to meet the special needs of" Indian children).[24] The statute authorizing federal impact funds for local educational agencies expressly provides that it is not meant "to relieve any State of any duty with respect to any citizens of that State," 20 U.S.C.A. § 240(b)(3)(F), and, of course, on-reservation Indians are citizens of the state within which they reside. *See Goodluck v. Apache County*, 417 F.Supp. 13, 16 (D.Ariz.1975), *aff'd mem. sub nom. Apache County v. United States*, 429 U.S. 876, 97 S.Ct. 225, 50 L.Ed.2d 160 (1976); *Cohen* at 639–40, 645, 649.

From these federal statutes and their implementing regulations, the court concludes that Congress did not intend the federal government to be the sole provider of Indian education, nor did it intend federal law to preempt state and local obligations to provide educational services for Native Americans.

This conclusion is consistent with that of perhaps the leading commentary on Indian law:

> At times state authorities have sought to deny services to reservation Indians because a federal substitute was available. It is true that the federal government has long supplied many services to tribal Indians. But the courts have not sustained this argument as a valid reason to deny state services. These decisions seem correct, because *federal benefits programs are not considered preemptive of state law.*

*Cohen* at 653 (emphasis added and footnotes omitted). None of these cases the District relies on compels a different conclusion.

### 3. Case Law

■■■ The District relies primarily on dicta in two Supreme Court cases to the effect that the federal government's "comprehensive federal scheme" for the education of on-reservation Navajos " 'left the State with no duties or responsibilities.' " *See Ramah Navajo Sch. Bd. v. Bureau of Revenue*, 458 U.S. 832, 843, 102 S.Ct. 3394, 3401, 73 L.Ed.2d 1174 (1982) (quoting *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 691, 85 S.Ct. 1242, 1246, 14 L.Ed.2d 165 (1965)).

The issue in *Ramah* was whether federal law preempted a state tax imposed on the gross receipts a non-Indian construction company received from a tribal school board for the construction of a school on the reservation. *See id.* at 834, 102 S.Ct. at 3396. In 1968, the State of New Mexico closed a small public high school that it had operated near the Navajo reservation and which children

---

**23.** The statute defines "local educational agency" to include a public board of education or other public authority within a state having administrative control or direction of public elementary or secondary schools in a city, county, school district or other political subdivision of the state. *See* 25 U.S.C.A. § 2651(5) & 20 U.S.C.A. § 2891(12).

**24.** The express purpose of chapter I assistance is "to improve the educational opportunities of educationally deprived children [including Indian children] by helping such children succeed *in the regular program of the local educational agen-*

cy...." 20 U.S.C.A. § 2701(b) (emphasis added). As early as 1966, the House Education and Labor Committee expressed its desire that, "eventually, all Indian children will attend regular public schools" and directed the Department of the Interior "to work closely with ... Federal, State, and local authorities ... to assure that programs and projects are developed to assure a continuity of educational programs among the several agencies serving the same general population." H.R.Rep. No. 1814, 89th Cong., 2d Sess. 9–10, *reprinted in* 1966 U.S.C.C.A.N. 3844, 3852.

from the Ramah Navajo Chapter of the Navajo tribe had attended. After the state closed the facility, the chapter established its own school board and operated a school in the abandoned facility.[25] In 1972 the chapter contracted with the BIA for the construction of a new school, with federal funds and on reservation land. The chapter subcontracted the actual construction work to a non-Indian firm. New Mexico required the construction company to pay a gross receipts tax. The company and the school board protested the imposition of the tax on the grounds that the tax was preempted by federal law and unlawfully burdened tribal sovereignty. The Court agreed, holding that "the comprehensive federal regulatory scheme and the express federal policy of encouraging tribal self-sufficiency in the area of education preclude the imposition of the state gross receipts tax in this case." *Id.* at 846–47, 102 S.Ct. at 3402–03.

The Court followed the analytical framework it had established in *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (discussed *supra* note 19). The Court first concluded that the "detailed [federal] regulatory scheme governing the construction of autonomous Indian educational facilities" was "comprehensive." 458 U.S. at 841, 102 S.Ct. at 3400. The Court next concluded that the state tax imposed an "additional burden" on the contractor and the school board, which "necessarily impedes the clearly expressed federal interest in promoting the 'quality and quantity' of educational opportunities for Indians by depleting the funds available for the construction of Indian schools." *Id.* at 842, 102 S.Ct. at 3401. The Court then concluded that the state had no countervailing interest that justified imposition of the tax:

> In this case, the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax. *Having declined to take responsibility for the*

education *of these Indian children,* the State is precluded from imposing an additional burden on the comprehensive federal scheme intended to provide this education—a scheme which has "left the State with no duties or responsibilities." *Warren Trading Post Co. v. Arizona Tax Comm'n,* [380 U.S.] at 691 [85 S.Ct. at 1246].

458 U.S. at 843, 102 S.Ct. at 3401 (emphasis added).

The Court's statement that the state had no duty or responsibility to provide Indian education must be understood in context. The state had abandoned its previous efforts to educate the Ramah Navajo children, and in the vacuum thus created, the federal government had stepped in with a "comprehensive" scheme for the construction of Indian-run schools. While that scheme did not "prevent the States from providing for the education of Indian children within their boundaries," *id.* n. 7, it did not require them to do so. Thus, where the state was in fact not educating Navajo children and where federal law had stepped in to make up the deficiency, the state could not rely on any alleged duty to provide Indian education as a justification for taxing the federally regulated construction activity. The Court specifically noted, "This case would be different if the State were actively seeking tax revenues for the purpose of constructing, or assisting in the effort to provide, adequate educational facilities for Ramah Navajo children." *Id.*

This case is clearly distinguishable from *Ramah.* Like *Bracker* and unlike this case, *Ramah* involved an exercise of state authority over commercial activities on a reservation. *Ramah* did not hold that federal law preempted any duty the state may have had to educate Navajo children. It only held a state tax preempted. The Court in *Ramah* did not consider whether the state had any duty under state law to provide education for the Ramah Navajo children; that issue never arose. *See supra* note 25.[26]

---

25. No one claimed that New Mexico had acted improperly in closing the school. Any obligation the state may have had to provide educational services for the children of the Ramah Navajo Chapter was simply not an issue.

26. The District suggests that, because New Mexico has a state constitutional provision similar to

Utah's providing for the establishment and maintenance of a system of public schools open to all the children of the state, *see* N.M. Const. art. XII, § 1 & art. XXI, § 4, *Ramah* implicitly held that New Mexico had no duty under its state constitution to educate Indian children. *Ramah* did not consider or even cite the New Mexico Constitu-

By contrast, this case does not involve the imposition of a state tax or regulation on reservation activity. Here, the federal government has not stepped in to provide the services the District is not providing.[27] And the District *has* in fact relied on its provision of services on the reservation, including educational services, to justify its taxation of non-Indian oil and gas development within the reservation. *See Amici Curiae* Brief of San Juan County, Duchesne County, and Uintah County, Utah, and the Boards of Education of San Juan County School District, Duchesne County School District and Uintah County School District [hereinafter Amici Brief] at 2–10, 19–21, *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) (a copy of which is included as appendix 14 to Appendix to Memorandum in Support of Joint Plaintiffs' Motion for Partial Summary Judgment (dkt. no. 73) [hereinafter Plaintiffs' Appendix]). Perhaps most important, the regulatory scheme for the specific activity regulated in *Ramah*—"construction · of autonomous Indian educational facilities," *see* 458 U.S. at 841, 102 S.Ct. at 3400—left little room for state action, *id.* at 841–42, 102 S.Ct. at 3400–01, whereas the federal scheme for Indian education generally contemplates significant state involvement, *see supra* pt. II.E.2.[28]

*Warren Trading Post,* the case from which *Ramah* took its "no duties" language, is even less on point. The issue in that case was whether the state could tax the gross income of a federally licensed trader's sales to reservation Indians on the reservation. The Court noted that Congress had enacted a comprehensive scheme regulating Indian trade and traders and concluded that the state tax was inconsistent with this federal scheme. *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 686, 690–91 & n. 18, 85 S.Ct. 1242, 1245–46 & n. 18, 14 L.Ed.2d 165 (1965). The Court's opinion contains some overly broad language that would seem to support the District's preemption argument. The Court stated:

> Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities. And in compliance with its treaty obligations the Federal Government has provided for roads, education and other services needed by the Indians.... And since federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax.

*Id.* at 690–91, 85 S.Ct. at 1245–46. (footnotes omitted).

The Court was perhaps guilty of hyperbole. The way the federal government "provided for" education on the reservation was to appropriate funds for school buildings, equipment and other educational measures. *See* Navajo and Hopi Tribes Rehabilitation Act, Pub.L. No. 81–474, § 1, 64 Stat. 44, 45 (codified at 25 U.S.C.A. § 631), *cited in Warren,* 380 U.S. at 692 n. 17, 85 S.Ct. at 1246 n.

tion and in fact cautioned against imputing to a branch of the federal government awareness of state laws. *See* 458 U.S. at 842–43 n. 6, 102 S.Ct. at 3401 n. 6. This court will not infer from *Ramah*'s total silence on the subject any intent on the part of the Supreme Court to express any opinion on, much less decide, the issue of a state's duty under its own constitution to educate its Native American citizens. In fact, the New Mexico Supreme Court has held that New Mexico's constitutional provision, which the District concedes is "virtually identical to Utah's," *see* Defendants' Reply Memorandum in Response to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment (dkt. no. 108) [hereinafter Defendants' Reply], at 26, *does* impose "some responsibility" on the state to educate Indian children, "even though Indian or federal schools might also be available in the

same district." *Prince v. Board of Educ.,* 88 N.M. 548, 543 P.2d 1176, 1183–84 (N.M.1975). *See also Hootch v. Alaska State–Operated Sch. Sys.,* 536 P.2d 793, 799, 801 (Alaska 1975) (a similar provision of the Alaska Constitution guarantees Alaska school-age children, including Native Alaskan children, a right to public education).

27. Although the BIA runs an elementary school at Navajo Mountain, neither the BIA nor the District offer any secondary education at Navajo Mountain.

28. *Ramah* itself recognized that "the early focus of the federal efforts in this area concentrated on providing federal *or state* educational facilities for Indian children...." 458 U.S. at 840, 102 S.Ct. at 3399 (emphasis added).

17. These funds were meant to supplement funds provided for the education of Indians generally. *See id.* Those general funds are provided to states as well as to the BIA, *see* 20 U.S.C.A. §§ 236, 238, 240(b), 644, 2701 & 2711; 25 U.S.C.A. §§ 452–458e, 2601–2624, both of which have historically provided education for on-reservation Indians, *see Cohen* at 177–78, 678; Office of Indian Education Programs, *supra* note 1, at 25, 35. The Court has since recognized that some of its language in *Warren* may have been overly broad, *see Department of Taxation & Finance v. Milhelm Attea & Bros.,* — U.S. —, —, —, 114 S.Ct. 2028, 2034, 2036, 129 L.Ed.2d 52 (1994), and, until this case, the District itself did not take *Warren's* broad language at face value. *See* Amici Brief at 15 n. 33 (suggesting that Utah local governments may well have a responsibility toward reservation residents).

*White v. Califano,* 437 F.Supp. 543 (D.S.D. 1977), *aff'd,* 581 F.2d 697 (8th Cir.1978), the "only case when the existence of a federal program contributed to a holding of no state responsibility," *Cohen* at 653, is also distinguishable. The issue in *White* was whether state and county officials had the power to order the involuntary commitment to a state facility of an allegedly mentally ill Indian residing in Indian country.[29] The court held that they did not.[30]

The *White* court based its ruling on two grounds. First, it held that involuntary commitment of a reservation Indian to a state facility would unduly infringe on tribal sovereignty. The court noted that "the process of committing someone involuntarily brings the power of the state deep into the lives of the persons involved in the commitment process." 437 F.Supp. at 549. The court found the nature of that intrusion "critical." *Id.* The court analogized involuntary commitment to criminal incarceration, which historically has lain outside a state's jurisdiction over reservation Indians, *see Langley v. Ryder,* 778 F.2d 1092, 1095–96 (5th Cir.1985) (state criminal jurisdiction over Indian country is generally preempted and is allowed only where Congress clearly and unequivocally grants such authority), and concluded, "One can scarcely conceive how the power of the state could be brought to bear upon a person with any greater severity." 437 F.Supp. at 549. Obviously, education intrudes much less on personal liberty than involuntary commitment or incarceration do (although the distinction may be lost on some reluctant young scholars). The educational process limits a person's freedom only to the extent the state's compulsory attendance laws are enforced. The tribe must consent to the application of state compulsory attendance laws, *see* 25 U.S.C.A. § 231, and, if the tribe is allowed a say in how education is provided to its members, it is difficult to see how providing educational opportunities to the students at Navajo Mountain would otherwise infringe unduly on tribal sovereignty, particularly where, as here, the tribe has solicited the state's help. *See also supra* n. 11 & p. 20; *infra* n. 31.

Second, the *White* court held that the federal government had preempted the field of involuntary commitment of mentally ill persons living on an Indian reservation. The court concluded that Congress, "by limiting the state's powers and by recognizing a unique relationship and resulting responsibility to the Indian people, has in this case acted to relieve the state of a responsibility otherwise owed by statute to its citizens." 437 F.Supp. at 558. As noted above, the congressional scheme for Indian education, unlike the congressional scheme for Indian health services, does not limit the state's

---

29. The plaintiff in *White* was trying to have her sister, Florence Red Dog, an indigent Indian living on a reservation, committed to the South Dakota Human Services Center. The district court in *White* stated the issue in terms of the state's power to involuntarily commit Ms. Red Dog and concluded that the state lacked the power. Apparently Ms. Red Dog was committed to the Human Services Center any way. *See* 437 F.Supp. at 555 n. 8; 581 F.2d at 697. The court of appeals stated the issue as, Who must pay for the mental health care provided to Ms. Red Dog at the Human Services Center—the State of South Dakota or the United States? 581 F.2d at 697.

30. Obviously, the District has the power to provide educational services on the reservation, since it is already providing such services at schools on the reservation, pursuant to the *Sinajini* consent decree. The District's own evidence shows that half the schools on the Navajo reservation are public schools. *See* Defendants' Reply ex. A.

power but expressly contemplates significant state involvement in educating on-reservation Indians and provides funding for state education of Indians.

For all these reasons, the court concludes that the United States' duty to educate the plaintiff children does not preempt the defendants' duty to educate them. The defendants are therefore not entitled to summary judgment to the extent their motion is predicated on the argument that they have no duty to educate the plaintiffs' or that any duty they have is federally preempted.

### F. The Scope of the District's Duty Under State Law

 There remains the question of the scope of the District's duty. Based on the federal statutes governing Indian education, the court concludes that Congress intended the education of on-reservation Indians to be a cooperative effort among the federal government, states and local school boards, the Indian tribes and Indian parents.[31] The fact that one entity may have a duty to educate on-reservation Indians does not excuse any other entity from fulfilling its own obligations. Cf. McNabb v. Bowen, 829 F.2d 787, 793–95 (9th Cir.1987) (where Congress intended health services to be provided to Indians both by the federal Indian Health Service and by state and local programs but the county denied responsibility for an Indian child's medical bills, the IHS had to pay for the child's care).

The precise scope of the District's obligation under state law is not clear. At least in dicta, the Utah Supreme Court has construed the provisions of the Utah Constitution providing for a free public education system "open to all" children of the state, see Utah Const. art. X, §§ 1 & 2, as follows:

> The requirement that the schools must be open to all children of the state is a prohibition against any law or rule which would separate or divide the children of the state into classes or groups, and grant, allow, or provide one group or class educational privileges or advantages denied another. No child of school age, resident within the state, can be lawfully denied admission to the schools of the state because of race, color, location, religion, politics, or any other bar or barrier which may be set up which would deny to such child equality of educational opportunities or facilities with all other children of the state. This is a direction to the Legislature to provide a system of public schools to which all children of the state may be admitted. It is also a prohibition against the Legislature, or any other body, making any law or rule which would deny admission to, or exclude from, the public schools any child resident of the state, for any cause except the child's own conduct, behavior, or health. The schools are open to all children of the state when there are no restrictions on any child, children, or group of children which do not apply to all children in the state alike. The provision for being open ... simply means that all children must have equal rights and opportunity to attend the grade or class of school for which such child is suited by previous training or development.
>
> ... There shall be provided, for each child in the state, a school suitable to its development and training, and as reasonably convenient for attendance as is practicable, which school such child shall have a right to attend....
>
> . . . . .
>
> ... When their home district provides a school suitable in its curriculum, faculty, and facilities for their stage of educational growth and development, free and open to them, and reasonably convenient for at-

---

31. The Navajo Nation has also assumed a responsibility for the education of its members. See Navajo Tribal Code tit. 10, § 102 (Supp. 1984–85) ("The Navajo Tribe, as a sovereign nation, has a responsibility to its people to oversee their education in whatever schools or school systems they are being educated, to assure that their education provides excellence in the academic program and high, realistic expectations for all students"). See generally id. tit. 10 (1978 & Supp.1984–85). The tribe has appropriated substantial sums for education. See Defendants' Exhibits ex. N (showing that over $9,000,000 in tribal funds were budgeted for the Division of Education in fiscal year 1992). The Navajo Tribal Code contemplates a cooperative effort among state, federal and tribal agencies. See Navajo Tribal Code tit. 10, §§ 2 & 4 (Supp.1984–85).

*tendance,* they are given all the constitution assures or provides for them.

*Logan City Sch. Dist. v. Kowallis,* 94 Utah 342, 77 P.2d 348, 350–51, 353 (1938) (emphasis added).

The only case the court has found directly on point, however, dismissed this language as merely "rather broad dicta." [32] *Hootch v. Alaska State–Operated Sch. Sys.,* 536 P.2d 793, 802 (Alaska 1975). *Hootch* held that the Alaska state constitution, which, like Utah's, required the state legislature to maintain a system of public schools "open to all children" of the state, did *not* confer any right to attend a secondary school in the community where a student resides. *Id.* at 799–805. "Without necessarily embracing" the Utah Supreme Court's construction of its own constitutional provision, the Alaska court noted "that the Utah court limited its notion of reasonable convenience by the concept of practicability and that what may be practicable in one state may not necessarily be practicable in another state." *Id.* The court further noted that, even though the constitutional right to an education does not include a right to local secondary schools, the constitutional guarantee of equal protection may. *See id.* at 798–99, 804–05.

Relying on *Kowallis,* the dissent in *Hootch* concluded that the state constitutional right to an "open" school system is violated when a student "must live away from home throughout the school year in order to attend school." *See Hootch,* 536 P.2d at 812 (Rabinowitz, C.J., dissenting). *Cf. Grant v. Michaels,* 23 P.2d 266, 271 (Mont.1933) (the "clear intent" of the Montana Constitution's provision for a "general, uniform and thorough system of public, free, common schools"

"is that adequate facilities for the education of all children must be furnished").

This court need not decide at this time whether or not the Utah Supreme Court would follow *Hootch.* The plaintiffs' specific claims in this case are for violations of the federal constitution's equal protection provisions and for violations of various federal laws. *Kowallis*'s "rather broad dicta" appears to make the state constitutional guarantee of open schools coextensive with equal protection guarantees. The court will therefore address the defendants' duty in the context of the plaintiffs' equal protection claim.

## G. *The Plaintiffs' Equal Protection Claim (First Claim for Relief)*

The plaintiffs' first claim for relief alleges that the defendants have deliberately discriminated against the plaintiffs based on their race, in violation of the equal protection provisions of the United States Constitution, Title VI of the Civil Rights Act of 1964 (specifically, 42 U.S.C.A. § 2000d) and the injunction and decree in the *Sinajini* case.[33]

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It was meant to prevent state actors from discriminating against persons based on their race or national origin. *See Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993); 3 Ronald D. Rotunda & John E. Nowak, *supra,* § 18.5 at 67. Official action that distinguishes between individuals on racial grounds falls within the core of the Equal Protection Clause's prohibition and is

---

**32.** *Kowallis* held that the state constitutional right to a free and open public school system did *not* prevent a school district from charging a nonresident fee to children living outside the district who could attend a suitable school in their own district but chose to attend school in another district. *See* 77 P.2d at 353–54.

**33.** To the extent the plaintiffs claim that the defendants' conduct violates the injunction and decree in the *Sinajini* case, that claim should properly be raised in that case, which is currently pending in this court, and not in this case. The plaintiffs suggest that the court in *Sinajini* refused to consider that claim. This court does not read the *Sinajini* decision that broadly. The

court in that case merely held that issues that were not covered by the consent decree and injunction, such as the District's duty to provide a secondary school at Navajo Mountain, were not properly before that court. *See* Order Denying Plaintiffs' Motion to Modify the Consent Decree by Granting Defendants' Motions to Strike Portions of Plaintiffs' Verified Motions, *Sinajini v. Board of Educ.,* No. 74–C–346A, slip op. at 3–9 (D.Utah November 29, 1993). (A copy of the court's order in *Sinajini* is attached as exhibit 1 to the plaintiffs' Joint Memorandum in Opposition to District Motion for Partial Dismissal (dkt. no. 19)). Actions that violate the terms of the injunction and consent decree can still be addressed in that case.

therefore subject to the most exacting scrutiny. *Shaw*, at ——, 113 S.Ct. at 2824. Such action will be upheld only if it is narrowly tailored to further a compelling governmental interest. *Id.* at ——, 113 S.Ct. at 2825.

The defendants first argue that the court should not apply the strict scrutiny reserved for racial classifications to the plaintiffs' equal protection claim because Native Americans are a political group, not a race. They rely on a line of Supreme Court decisions holding that federal statutes singling out Native Americans for special treatment do not violate equal protection guarantees. *See, e.g., Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 500–01, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979) (holding that a state law that allowed the state to assume only partial jurisdiction over Indians and Indian territory did not require strict scrutiny and was rationally related to a valid state objective); *United States v. Antelope*, 430 U.S. 641, 646–50, 97 S.Ct. 1395, 1399–1400, 51 L.Ed.2d 701 (1977) (holding that federal criminal statutes subjecting Native Americans to federal prosecution did not violate equal protection even though they arguably lessened the burden the prosecution would have had under state law); *Fisher v. District Court*, 424 U.S. 382, 390–91, 96 S.Ct. 943, 948, 47 L.Ed.2d 106 (1976) (holding that Indians could be denied access to state courts in connection with an adoption proceeding arising on a reservation); *Morton v. Mancari*, 417 U.S. 535, 553–55, 94 S.Ct. 2474, 2484–85, 41 L.Ed.2d 290 (1974) (upholding a limited employment preference for Indians). The defendants argue that the court should therefore uphold its treatment of the plaintiffs as long as the District has a rational basis for treating the plaintiffs differently from other students.

The doctrine the District relies on evolved from cases that challenged statutes meant to protect or benefit Indians and did not involve invidious discrimination against Indians, such as the plaintiffs have alleged in this case. Moreover, those decisions were based on Congress's constitutional power to regulate Indian affairs and the special relationship of the federal government to Indians: "such regulation is rooted in the unique status of Indians as 'a separate people' with their own political institutions. Federal regulation of

Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a " 'racial" group consisting of "Indians" . . . .' " *Antelope*, 430 U.S. at 646, 97 S.Ct. at 1398 (quoting *Morton v. Mancari*, 417 U.S. at 553 n. 24, 94 S.Ct. at 2484 n. 24). The legislative classifications the Court has upheld have often been directed not towards "Indians" as such but towards members of federally recognized tribes and, at least in some instances, have actually excluded some persons who would have been deemed Indians by race. *See Mancari*, 417 U.S. at 553 n. 24, 94 S.Ct. at 2484 n. 24.

▆ When it comes to governmental action affecting Indians, the line between permissible political classifications and impermissible racial classifications is not always easy to draw. *See generally Cohen* at 654–56. However, the test seems to be whether "the special treatment [afforded Indians] can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians"; if so, the legislative judgment "will not be disturbed." *See Mancari*, 417 U.S. at 555, 94 S.Ct. at 2485. *See also Cohen* at 657–58 (concluding that legislation rationally related to "the unique status of Indian tribes under the Constitution and treaties" is not proscribed by the equal protection principle, whereas legislation "dealing with Indians as a discrete class but not reasonably related to their federal status should be tested against the stricter equal protection standards prohibiting discrimination based on race, ancestry, or national origin") (footnote omitted).

▆ The District, of course, does not enjoy the same special relationship with and power to regulate Indian tribes that the federal government has. *See Washington v. Confederated Bands*, 439 U.S. at 501, 99 S.Ct. at 761. The District has not shown how its allegedly disparate treatment of the plaintiffs is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." The District does not have to withhold its services for the federal government to fulfill any obligation it may have to educate the plaintiffs. Absent such a showing, local school boards are simply not free to

discriminate between Indians and non-Indians based solely on their status.

The District, however, does not discriminate against Native Americans per se. It is undisputed that the District's schools are open to all and that the District educates over a thousand Native American students in its schools, which include two high schools on or near the reservation.[34] *See* Affidavit of Kent Tibbitts (exhibit P to Defendants' Exhibits) ¶¶ 2 & 3. *See also* Defendants' Response to Plaintiffs' First Set of Requests for Admissions (appendix 9 to Plaintiffs' Appendix) at 5, ¶ 15 (asserting that the District has approximately 3,400 students, about half of whom are Native Americans). The plaintiffs' complaint is not that the District excludes Native Americans from its schools but that it does not provide educational services at Navajo Mountain.

The District's failure to provide education services at Navajo Mountain may still violate the Equal Protection Clause. However, to establish an equal protection violation the plaintiffs concede that they must show either (1) that the District's policy of not providing educational services at Navajo Mountain is racially discriminatory on its face, or (2) that the policy, although neutral on its face, is motivated by discriminatory intent. *See* Plaintiffs' Memo. at 31. *See also Washington v. Davis,* 426 U.S. 229, 238–42, 96 S.Ct. 2040, 2046–49, 48 L.Ed.2d 597 (1976); 3 Ronald D. Rotunda & John E. Nowak, *supra,* § 18.4 at 42 (a classification can be established as an impermissible racial classification in three ways—on its face, as applied, or by its disparate impact).

Perhaps recognizing that the District's intent may present a factual question precluding summary judgment, the plaintiffs have limited their motion for summary judgment on their equal protection claim to the District's alleged policy of treating Native Americans at Navajo Mountain differently from other students at Navajo Mountain, which, the plaintiffs claim, is discriminatory on its face.

In response to discovery requests, the defendants admitted that, when the BIA notifies the District that it has a non-Native American student in its school at Navajo Mountain, the District applies to the State for funds for that student and forwards them to the BIA to help defray the cost of that student's education. *See* Defendants' Answers and Objections to Plaintiffs' Amended First Set of Interrogatories (appendix 8 to Plaintiffs' Appendix), at 6. That is because the BIA provides a free public education to Native American children in the BIA school at Navajo Mountain but requires non-Native American children to pay for their education, since non-Native American students are not entitled to a free education, as Native Americans are, under federal treaties, statutes and regulations. *See id.* The plaintiffs claim that the defendants' admission shows, as a matter of law, that the District has a policy and practice of excluding Native Americans at Navajo Mountain from its educational programs.

The District's alleged policy does not establish an equal protection violation as a matter of law. The Equal Protection Clause only requires equal treatment of persons similarly situated. *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). It "does not require things which are different in fact or opinion to be treated in law as though they were the same." *Id.* (quoting *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)). Indian and non-Indian children at Navajo Mountain are not similarly situated. The BIA provides a free elementary education to the former but not to the latter. The District helps make up for this disparity by subsidizing the education of non-Indian students at the BIA school. By doing so, the District enables non-Indian children at Navajo Mountain to attend the BIA school and receive the same education that Indian children receive for free. Indian children are not adversely affected by the District's actions. The District's actions in this regard do not violate the Equal Protection Clause;

---

**34.** In fact, it appears that at least two members of the plaintiffs' putative class attend high school within the District. *See* Second Affidavit of Jamie Holgate (appendix 2 to the Class Certifica-tion Memo.), attachment; Affidavit of Rose Atene (appendix 3 to the Joint Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction) ¶ 4.

in fact, the District might have violated equal protection if it did *not* provide funds to help defray the cost of non-Indian children's education at the BIA school.

▆▆▆ While the District's alleged policy of providing funds for non-Native American students at Navajo Mountain does not violate equal protection because such students are not similarly situated to Native American students at Navajo Mountain, the District's failure to provide any other educational services to students at Navajo Mountain could violate equal protection. That policy, however, is not discriminatory on its face. It is undisputed that the District itself does not provide anyone an education at Navajo Mountain, and, by the plaintiffs' own theory of this case, at least some of the students at Navajo Mountain are not Native Americans.

▆▆▆ The plaintiffs suggest that the District's policy of not providing educational services at Navajo Mountain violates equal protection because it has a disparate impact on Native Americans. The District admits that "virtually all of the residents of Navajo Mountain are Native Americans." Defendants' Memorandum in Opposition to the Plaintiffs' Joint Motion for Partial Summary Judgment (dkt. no. 93) [hereinafter Defendants' Opposition Memo.] at 4, ¶ 7. However, even if the plaintiffs establish that the District's policy of not providing educational services at Navajo Mountain has a discriminatory effect on Native Americans, that still does not entitle them to summary judgment. A racially disproportionate impact alone is not enough to establish an equal protection violation. *Washington v. Davis*, 426 U.S. at 239–42, 96 S.Ct. at 2047–49. "[T]he invidious quality of a law [or practice] claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Id.* at 240, 96 S.Ct. at 2047. Although "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts," *id.* at 242, 96 S.Ct. at 2049, unless only one inference can be drawn from the undisputed facts, it is for the trier of fact to decide whether to draw an inference of intentional discrimination. *Cf. Lewis v. City of Ft. Collins*, 903 F.2d 752, 759 (10th Cir.1990) (summary judgment will not lie if the evidence of discriminatory motive is such that a reasonable jury could return a verdict for the nonmoving party).

There is ample evidence in this case from which a trier of fact could conclude that the District has not provided services at Navajo Mountain, not because District officials are prejudiced against Indians, but because of the practical problems of delivering services to Navajo Mountain—perhaps the most remote area of the entire Navajo Reservation—and because of confusion over whether the District has a legal obligation to provide educational services at Navajo Mountain. *See, e.g.*, Defendants' Answers and Objections to Plaintiffs' Amended First Set of Interrogatories (appendix 8 to Plaintiffs' Appendix), at 6–7 (the District has considered education at Navajo Mountain the BIA's responsibility, not its own). In fact, despite its belief that it had no duty to educate the children of Navajo Mountain, before this action was filed the District helped organize a task force, consisting of representatives of the District, the BIA and the Navajo Mountain chapter of the Navajo Nation, to consider solutions to the education problems at Navajo Mountain. *See* Affidavit of Jerald Mikesell (exhibit K to Defendants' Exhibits), at 2–3. On the present state of the record, a trier of fact could reasonably conclude that this situation arose not from racially discriminatory motives "but from the uncertain state of the law and the harsh fact that everybody's resources are finite." *White v. Califano*, 437 F.Supp. 543, 558 (D.S.D.1977), *aff'd*, 581 F.2d 697 (8th Cir.1978). The court concludes that the District's intent in not providing educational services at Navajo Mountain is a genuine issue of material fact precluding summary judgment on the plaintiffs' equal protection claim.

▆▆▆ There may be other factual questions that make summary judgment inappropriate as well. As noted, the Equal Protection Clause only requires that similarly situated persons be treated equally. *See Plyler v. Doe*, 457 U.S. at 216, 102 S.Ct. at 2394. Whether the District has a duty under the Equal Protection Clause to provide a secondary school at Navajo Mountain may depend on such matters as the nature and quality of the education the plaintiffs are currently re-

ceiving, the nature and quality of the education they could receive at Navajo Mountain, the criteria the District follows in deciding whether to build a new high school and how the District treats other students similarly situated (assuming that there are others)—facts that have yet to be fully developed. Because the scope of the defendants' duty under the Equal Protection Clause depends on facts that are not yet fully developed and may well be disputed, the parties are not entitled to summary judgment at this time on the plaintiffs' equal protection claims. *Cf. Kennedy v. Silas Mason Co.,* 334 U.S. 249, 256–57, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948) ("summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import"; a "judgment of this importance" should proceed from a thorough record; it is "good judicial administration to withhold decision of the ultimate questions involved" in such a case until the record "shall present a more solid basis" for ruling). *See also Anderson v. Hodel,* 899 F.2d 766, 770–71 (9th Cir.1990) (summary judgment may be improper because the legal issues require "further factual elucidation" for their "prudently considered resolution") (quoting *Eby v. Reb Realty, Inc.,* 495 F.2d 646, 649 (9th Cir.1974)); *Hootch v. Alaska State–Operated Sch. Sys.,* 536 P.2d 793, 808 (Alaska 1975) (declining to reach an equal protection claim because of "the desirability of developing the factual issues normally so vital to resolution of" such a claim and remanding the case for presentation of further evidence).

H. *The Plaintiffs' Title VI Claim (First Claim for Relief)*

■■■■ The plaintiffs' first claim for relief also alleges a violation of title VI of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000d through 200d–4a (1994), and its implementing regulations, 34 C.F.R. §§ 100.1–100.13 (1994). Title VI prohibits racial discrimination in programs receiving federal funds. *See* 42 U.S.C.A. § 2000d ("No

person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"). Title VI itself provides no greater protection than the Equal Protection Clause. *United States v. Fordice,* 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 2738 n. 7, 120 L.Ed.2d 575 (1992); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1405–06 n. 11 (11th Cir.1993). The plaintiffs concede that a violation of title VI, like a violation of the Equal Protection Clause, requires a showing of intentional discrimination. Plaintiffs' Memo. at 38–39 (citing *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 608 n. 1, 103 S.Ct. 3221, 3235 n. 1, 77 L.Ed.2d 866 (1983) (Powell, J., concurring and analyzing votes)). *See also Alexander v. Choate,* 469 U.S. 287, 293 & n. 8, 105 S.Ct. 712, 715 & n. 8, 83 L.Ed.2d 661 (1985). Whether or not the defendants had the requisite intent to discriminate against the plaintiffs based on their race is a genuine issue of material fact. *See supra* pt. II.G. Therefore, the plaintiffs are not entitled to summary judgment at this time on their title VI claim.

■■■ Although title VI itself only reaches intentional discrimination, the Supreme Court has held that federal agencies can redress, by regulation, actions that have an unjustifiable disparate impact on minorities, regardless of any intent to discriminate. *See Alexander,* 469 U.S. at 293 & n. 9, 105 S.Ct. at 716 & n. 9 (citing *Guardians,* 463 U.S. at 584, 103 S.Ct. at 3223 (per White, J.), 623, 103 S.Ct. at 3243 (per Marshall, J.), and 634, 103 S.Ct. at 3249 (per Stevens, J., joined by Brennan and Blackmun, JJ.)).[35] The Department of Education (DOE) has promulgated such regulations. Under DOE regulations, a recipient of federal aid,

> in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to

---

**35.** The anomalous result of the Court's title VI jurisprudence "appears to be that the administrative regulations implementing the statute are valid and enforceable even though they proscribe behavior which arguably the Court has said is

not prohibited by the statute itself." *Knight v. Alabama,* 787 F.Supp. 1030, 1362 (N.D.Ala. 1991), *aff'd in part, rev'd in part on other grounds, & vacated in part,* 14 F.3d 1534 (11th Cir.1994).

whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, ... may not ... utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

34 C.F.R. § 100.3(b)(2) (originally adopted as 45 C.F.R. § 80.3(b)(2)). Moreover, the regulations prohibit a recipient of federal aid from making selections regarding "the site or location of" facilities that have

the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any programs to which this regulation applies, on the ground of race, color, or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of [title VI] or this regulation.

*Id.* § 100.3(b)(3).

The District claims that these regulations do not apply because they apply only to programs receiving federal funds, *see id.* § 100.2 (the regulations apply "to any program for which Federal financial assistance

is authorized to be extended to a recipient under a law administered by the Department"),[36] and the District does not receive federal funds for Navajo Mountain residents.

▪ The District has construed the scope of the regulations too narrowly. The issue is not whether the District receives federal funds for Navajo Mountain residents but whether the District receives federal funds at all. If it does, then it cannot discriminate against Navajo Mountain residents based on their race in the programs for which it receives those funds, regardless of whether it includes Navajo Mountain residents in its request for funds.[37] Otherwise, the District could purposefully discriminate against a racial group simply by refusing to include the group in its application for federal monies. The focus is on the program receiving federal money and not on a specific application of that program. *Cf. United States v. Texas,* 628 F.Supp. 304, 322 (E.D.Tex.1985) (the fact that no federal money was specifically channeled into a state's testing program for prospective teachers did not excuse the state from complying with title VI where the testing program was clearly part of the state's teacher education program and the teacher education program received federal funds), *rev'd on other grounds,* 793 F.2d 636 (5th Cir.1986).

**36.** The regulations specifically identify school construction funds under 20 U.S.C. §§ 631–47 and federal impact aid under 20 U.S.C. §§ 236–41 as programs to which the regulations apply, *see* 34 C.F.R. pt. 100, app. A, pt. 1, ¶¶ 3, 17, but caution that, if title VI is otherwise applicable, the fact that a program is not listed in the regulations does not mean that the program is not covered, 34 C.F.R. § 100.2.

**37.** Congress has rejected a program-specific reading of title VI. In 1984 the Supreme Court held that a university whose students received federal funds was subject to title IX's prohibition against sex discrimination, but only with respect to the university program actually benefited by the federal aid and not with respect to other programs. *See Grove City College v. Bell,* 465 U.S. 555, 563–74, 104 S.Ct. 1211, 1216–22, 79 L.Ed.2d 516 (1984). In response to the *Grove City* decision, Congress amended title VI to include an expansive definition of "program or activity." Under the current definition, "program" means "all of the operations of," among other things, "a local educational agency ... or other school system" "any part of which is ex-

tended Federal financial assistance." 42 U.S.C.A. § 2000d–4a. "Local educational agency" is defined to include local school boards. *See id.* § 2000d–4a(2)(B) & historical & statutory notes; 20 U.S.C.A. § 2891(12). Under the current definition of "program," courts have held that entities receiving federal funds are subject to title VI's proscription against racial discrimination even if the allegedly discriminatory program receives no federal funds itself. *See, e.g., Association of Mexican–Am. Educators v. California,* 836 F.Supp. 1534, 1543–44 (N.D.Cal.1993). The definition of "program" under the DOE regulations, however, is narrower than the statutory definition. The regulations define "program" as "any program, project, or activity for the provision of services, financial aid, or other benefits to individuals (including education or training ...), or for the provision of facilities for furnishing services, financial aid or other benefits to individuals." 34 C.F.R. § 100.13(g). Thus, the regulations may not cover as broad a range of activities as the statute does. But even under the regulations, the focus is on programs (considered as a whole) and not just on the specific students included in a funding request.

The District argues, however, that federal law prohibits it from using federal funds for the benefit of Navajo Mountain residents and that it cannot violate title VI or its regulations by complying with the law governing the use of the funds it receives. To comply with both title VI and the federal funding statutes under which the District receives federal monies, the District may have to include Navajo Mountain residents in its funding requests. But the District cannot escape the requirements of title VI and its regulations simply by refusing to request any funds for Navajo Mountain residents. The fact that the District does not count Navajo Mountain residents in its applications for federal funds and thus, to that extent, does not receive federal funds earmarked for Navajo Mountain residents does not excuse the District from including Navajo Mountain residents in its federally funded programs if the effect of its decision is to discriminate against them because of their race. Cf. Natonabah v. Board of Educ., 355 F.Supp. 716, 726 (D.N.M.1973) (a school district could not escape liability for misuse of Johnson–O'Malley funds on the grounds that it only used the funds for the purposes stated in its funding applications).

Nevertheless, the court concludes that the plaintiffs are not entitled to summary judgment on their disparate impact claim at this time. Although it is undisputed that the District receives federal categorical funds, see Defendants' Opposition Memo. at 8, ¶ 17, it is not clear from the record exactly what types and amounts of federal funds the District receives, nor is there any evidence of how the District uses the funds it receives (other than the fact that the District does not use any federal funds at Navajo Mountain) or what criteria the District applies in its decisions. Whether the District has violated the DOE regulations depends on what programs the District administers with federal funds, the criteria or methods it uses in administering those programs and the effect of its decisions on Native Americans and non-Native Americans within the District generally (not just at Navajo Mountain). These are issues that require further factual development. For example, although it is undisputed that the District does not provide educational services at Navajo Mountain, the BIA does. The parties dispute how that education compares with the education the District provides similarly situated students. Compare, e.g., Affidavit of Beverly Crawford (Defendants' Exhibits ex. J), ¶¶ 2–3 (the BIA school has full elementary facilities and is fully accredited), and Affidavit of Kent Tibbitts (Defendants' Exhibits ex. P) ¶ 10 (the BIA facility and equipment compare favorably with state facilities serving similar student populations), with Affidavit of Jamie R. Holgate (Plaintiffs' Appendix app. 7), at 2–3 (the educational opportunities offered at the BIA school are not comparable in certain respects to those offered in public schools, and the BIA school has taken cost-cutting measures that have adversely affected the education it provides). If the education the BIA provides is equivalent to any education the District could provide and if other Native American children in the District already receive a disproportionately large share of federal funds, the District's policies may not have an impermissibly discriminatory effect on Native Americans, and its use of federal monies may not violate federal regulations. Cf. Grimes v. Sobol, 832 F.Supp. 704, 711 (S.D.N.Y.1993) (the DOE regulations only "require schools to provide students with 'the opportunity to obtain the education generally obtained by other students in the system'") (quoting 33 Fed.Reg. 4956 (1968)), aff'd, 37 F.3d 857 (2d Cir.1994). Also, on the present state of the record, the court cannot say whether the District's policy of not providing educational services to children living in remote areas also affects non-Indian children and thus cannot say that the District's policy, viewed as a whole, affects Native American children disproportionately. The record simply does not allow the court to make such determinations at this time. The court will therefore deny the plaintiffs' motion for summary judgment on their disparate impact claim to allow the parties to develop a more complete factual record. Cf. Kennedy v. Silas Mason Co., 334 U.S. 249, 256–57, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948); Anderson v. Hodel, 899 F.2d 766, 770–71 (9th Cir.1990); Hootch v. Alaska State–Operated Sch. Sys., 536 P.2d 793, 808 (Alaska 1975).

## I. The Plaintiffs' Claim Based on Federal Funding Laws (Second Claim for Relief)

The plaintiffs' second claim for relief alleges that the defendants have violated various federal funding laws by not using federal funds for the benefit of students who reside at Navajo Mountain. It is undisputed that the defendants have not used federal monies for the benefit of the residents of Navajo Mountain. On the other hand, the defendants have not counted Navajo Mountain students in their requests for federal monies, see Affidavit of Kent Tibbitts (Defendants' Exhibits ex. P), at 3, ¶ 6, and claim that they may have been in violation of federal law if they had spent the monies they received for the benefit of students at Navajo Mountain.

The defendants have only violated federal funding laws if those laws require them to expend funds for the benefit of children at Navajo Mountain. Whether or not they do depends on the terms of the specific statute or regulation. The court will therefore consider the specific statutes and regulations the plaintiffs rely on in their moving papers.

 The plaintiffs first rely on section 240(b) of the Federally Impacted Areas Act. That section requires local educational agencies to establish policies and procedures to insure that "Indian children *claimed under section 238(a)* of this title participate on an equal basis in the school program with all other children educated by the local educational agency." 20 U.S.C.A. § 240(b)(3)(B)(i) (emphasis added).[38] In applying for federal impact aid, the District does not claim the children at Navajo Mountain under section 238(a), so it is not required under section 240(b) to provide them with educational services. Cf. Schwartz v. O'Hara Tp. Sch. Dist., 375 Pa. 440, 100 A.2d 621, 623 (1953) (the Federally Impacted Areas Act does not "impose upon any local political subdivision the responsibility of supplying [educational] facilities").[39]

 The plaintiffs next cite the Johnson–O'Malley Act, codified as reenacted and amended at 25 U.S.C.A. §§ 452–57. The plaintiffs have not pointed to any provision of the Johnson–O'Malley Act itself that requires the defendants to provide educational services at Navajo Mountain. Instead, they rely on the regulations promulgated under the act. Those regulations set forth the application and approval process for education contracts under the Johnson–O'Malley Act. See 25 C.F.R. § 273.1(a) (1994). The District's contract under the Johnson–O'Malley Act is not part of the record in this case, nor is there any evidence of record as to how the District uses the Johnson–O'Malley funds it receives. Moreover, the regulations themselves are not clear as to whether they require the District to apply for and expend Johnson–O'Malley funds on behalf of students at Navajo Mountain. The regulations exclude from their definition of students eligible for benefits under a Johnson–O'Malley

**38.** Section 238(a) requires the Secretary of Education to determine "the number of children who were in average daily attendance at the schools of [a local educational agency], and for whom such agency provided free public education, during [the] fiscal year, and who, while in attendance at such schools, resided on Federal property...." 20 U.S.C.A. § 238(a). It is undisputed that the plaintiffs were not in attendance at the District's schools and that the District did not provide them a free public education.

**39.** The District relies heavily on *Schwartz* for its argument that it has no duty to educate the children of Navajo Mountain. *Schwartz* held that a local school district did not have to provide a free education to school-age children living on federal property (the grounds of a Veterans Administration hospital). The court based its decision on, among other things, its conclusion that residents of federal areas are not residents of the state within which the area is located. 100 A.2d at 624–25. The law is now well

settled that Indians living on a reservation are citizens of the state where the reservation is located. See Goodluck v. Apache County, 417 F.Supp. 13, 16 (D.Ariz.1975), aff'd mem. sub nom. Apache County v. United States, 429 U.S. 876, 97 S.Ct. 225, 50 L.Ed.2d 160 (1976). The *Schwartz* court also relied in part on its conclusion that federal policy, as expressed in the Federally Impacted Areas Act, was *not* to "impose upon local school districts the cost of public education for the children of residents of Federal areas." 100 A.2d at 623. Regardless of whether the federal impact aid law imposes a legal duty on local school districts to educate children living on federal land, it recognizes that the task of educating such children will generally fall on local school districts. The purpose of the act is to help ease the burden on local school districts. See 20 U.S.C.A. § 236(a). Federal impact aid contemplates that state and local agencies will educate children on federal land. It does not excuse them from doing so, as *Schwartz* suggests. Thus, *Schwartz*'s reasoning is suspect.

contract Indian students enrolled in a BIA-operated school. *See id.* § 273.12. Thus, Native American students who attend the BIA elementary school at Navajo Mountain or who attend a BIA secondary school away from Navajo Mountain are not eligible for Johnson–O'Malley funds and may not have grounds to complain about how they are spent.

Although the regulations require districts receiving Johnson–O'Malley funds to provide Indian children and non-Indian children with comparable educational opportunities before expending Johnson–O'Malley funds, *see id.* § 273.34(b), and prohibit discrimination against Indians, *see id.* § 273.38, it is not clear whether those provisions apply to all Indian children in the district (including those ineligible for Johnson–O'Malley benefits) or only to those for whose benefit the district actually receives Johnson–O'Malley funds. In any event, whether the District provides comparable educational opportunities to all children in the District or has discriminated against the children of Navajo Mountain because they are Indians depends on facts that need further development. *See supra* pt. II.G. Moreover, the plaintiffs have not met their burden of showing that they have a private right of action to enforce the Johnson–O'Malley regulations. Therefore, the plaintiffs are not entitled to summary judgment on their claim based on the regulations at this time.

▮ The plaintiffs also rely on various provisions of title I of the Elementary and Secondary Education Act of 1965, now referred to as chapter I (codified as amended at 20 U.S.C.A. §§ 2701–3386 (1990 & Supp. 1994)), and its implementing regulations, 34 C.F.R. ch. II, pt. 200 (1994). All of the provisions the plaintiffs rely on come under part A of chapter I.[40] Part A expressly provides:

> A local educational agency may use funds received under this part only for programs and projects which are designed to meet the special educational needs of educationally deprived children identified in accordance with section 2724 of this title *and which are included in an application for assistance approved by the State educational agency.*

20 U.S.C.A. § 2721(a)(1) (emphasis added). It is undisputed that the District does not include the children of Navajo Mountain in its application for chapter I assistance. Therefore, the District cannot use chapter I monies for programs or projects designed to meet their special educational needs. None of the specific provisions the plaintiffs rely on require the District to apply for or use chapter I funds to meet the special educational needs of the children at Navajo Mountain. *See supra* note 40. If the District has an obligation to apply for chapter I monies for the benefit of the children of Navajo Mountain, it must therefore be found somewhere other than in chapter I (such as under the Equal Protection Clause or title VI). The court cannot say that, simply by not applying for chapter I monies for Navajo Mountain, the District has violated chapter I as a matter of law.

In short, none of the federal funding statutes or regulations the plaintiffs have cited (with the possible exception of the regulations under the Johnson–O'Malley Act) require the District to use federal funds at Navajo Mountain, and the District has not violated those statutes and regulations by failing to apply for and use federal funds at Navajo Mountain. Therefore, the plaintiffs are not entitled to summary judgment on their second claim for relief. Because ques-

---

40. Specifically, the plaintiffs rely on 20 U.S.C.A. § 2722(c)(1) and 34 C.F.R. § 200.32, which require local educational agencies to use chapter I funds for programs that are "of sufficient size, scope, and quality to give reasonable promise of substantial progress toward meeting the special educational needs of the children being served." Because the children of Navajo Mountain are not included in the District's chapter I requests, they are not "children being served" by the District's chapter I programs and are therefore not covered by sections 2722(c) and 200.32. The plain-

tiffs also rely on 20 U.S.C.A. § 2728(c) and (d) and 34 C.F.R. § 200.43, relating to the fiscal requirements for receiving chapter I funds, which require a local educational agency to provide services to schools or project areas receiving chapter I funds that, "taken as a whole, are at least comparable to services being provided in areas in such district which are not receiving [chapter I] funds." 20 U.S.C.A. § 2728(c)(1). Again, because Navajo Mountain does not receive any chapter I monies, those provisions do not apply.

tions still exist as to the District's potential liability under the Johnson–O'Malley regulations, however, the District is also not entitled to summary judgment on the plaintiffs' second claim for relief.

### III.

### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The plaintiffs have moved the court to allow them to maintain this action as a class action under Federal Rule of Civil Procedure 23. The plaintiffs propose the following classes or subclasses: (1) all Native American school-age children in the District in the area known as Navajo Mountain, (2) all parents and guardians of Native American school-age children at Navajo Mountain, (3) all members of the Navajo Tribe affected by the defendants' acts and omissions, (4) all current or prospective Native American elementary and secondary children and students and their parents at Navajo Mountain, (5) all current or prospective Native American children and students in the District who reside at Navajo Mountain and who are the intended beneficiaries of federal categorical programs maintained by the defendants, and (6) all adult students eligible for a free public education from the defendants and who are entitled to compensatory educational services as a result of the defendants' acts and omissions.

■ Although an order determining whether an action is to be maintained as a class action should be entered "[a]s soon as practicable after the commencement of [the] action," Fed.R.Civ.P. 23(c)(1), an order regarding class certification can be made at any time before or, under some circumstances, even after a final judgment has been rendered. *See Gurule v. Wilson*, 635 F.2d 782, 788–89 (10th Cir.1980), *overruled on other grounds by Cox v. Flood*, 683 F.2d 330, 331 (10th Cir.1982); *Marshall v. Kirkland*, 602 F.2d 1282, 1301 (8th Cir.1979). The court has discretion to determine the most appropriate point in the proceedings for certification. *Jiron v. Sperry Rand Corp. (Sperry–Univac)*, 423 F.Supp. 155, 167 (D.Utah 1975). The court believes that a ruling on the issue of class certification is premature in this case where further discovery and factual development may narrow the issues and affect the definitions of the putative class or classes. *Cf. Chateau de Ville Prods., Inc. v. Tams–Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir.1978) (the court should defer decision on class certification pending discovery if the existing record is inadequate for resolving relevant issues); *Link v. Mercedes–Benz of N. Am. Inc.*, 550 F.2d 860, 864 (3d Cir.) (a class action determination should be made after the court has had adequate opportunity to acquaint itself with the case and the complexities likely to be encountered in its disposition), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Therefore, the court will deny the plaintiffs' motion for class certification at this time, without prejudice to the plaintiffs' right to renew the motion at a later time.

### IV.

### CONCLUSION

■ The court concludes that all of the entities involved in this case—the District, the State, the United States and the Navajo Nation—each has a duty to educate the children of Navajo Mountain. The duty of one does not relieve any other of its own obligation. The precise scope of that duty may depend on facts that have yet to be developed.

The State candidly acknowledges some responsibility for educating the plaintiffs but recognizes that it cannot effectively operate within the reservation without the cooperation of the federal government and the Navajo Nation. No one is benefited by the parties' efforts to fix the sole responsibility for the plaintiffs' education on one entity or another. As the State says:

[T]he focus should be on the interest of the children, and the method should be one of cooperation among the entities, each of which has some authority and means to educate the student[s]. . . .

. . . . .

As a practical matter, it may well be that no entity alone can realistically provide an adequate education for Navajo youth and that only the combined effort and resources of all entities can accomplish the desired goal of quality education.

Memorandum Setting Forth Utah State Board of Education's Position as Amicus Curiae on Education on the Navajo Reservation Within Utah (dkt. no. 109), at 21–22.

The District itself previously recognized that "within Indian Reservations governmental responsibilities traditionally borne by states are shared by federal, state and tribal governments." See Amici Brief at 23. As the District explained:

> This occurs not because the responsibility or commitment of state and local government is less, but because the needs of Reservation residents are greater. The combined efforts of all three sovereigns [federal, state and tribal] are necessary to the improvement of Reservation life. Utah Local Governments . . . are an integral part of this effort.

Id.

It appears that the parties tried to cooperate before this action was filed. In November 1993 three members of the Board traveled to the BIA school at Navajo Mountain to meet with BIA officials, Navajo Mountain residents and representatives of the Navajo Mountain Chapter of the Navajo Nation to discuss the education of Navajo Mountain students. As a result of that meeting, a task force comprised of District officials, tribal officials and BIA personnel was formed to study the issues further. See Affidavit of Jerald Mikesell (exhibit K to Defendants' Exhibits), at 2–3; Minutes of Navajo Mountain BIA & San Juan School District Joint Board Meeting, November 16, 1993 (exhibit C to Defendants' Exhibits). The task force was disbanded, however, after this action was filed. See Affidavit of Dr. Jerald Mikesell (exhibit C to Defendants' Opposition Memo.), ¶ 5.

It appears that the parties' previous efforts at cooperation may have failed partly because of uncertainty over who was responsible for education at Navajo Mountain. The

court's opinion should now make it clear that all entities involved—the District, the State of Utah, the United States (through the BIA) and the Navajo Nation—have a responsibility for education at Navajo Mountain.

It also appears, however, that the previous efforts at cooperation may have failed at least in part because the parties disagreed as to the best solution for the problems at Navajo Mountain. Apparently the District believes that the BIA school should be expanded to include grades K through 12, since the school currently has the capacity to house and educate all the secondary-school-age children of Navajo Mountain.[41] The Navajo Mountain Chapter of the Navajo Nation, on the other hand, apparently does not want to use the under-used BIA school to provide secondary education but wants the District to build a new high school at Navajo Mountain.

 It may be that the District has an obligation to provide a high school at Navajo Mountain. See, e.g., Logan City Sch. Dist. v. Kowallis, 77 P.2d 348, 351 (Utah 1938) (the state constitutional provision requiring a system of public schools open to all children of the state requires a school suitable to a child's development and training and "as reasonably convenient for attendance as is practicable"); Grant v. Michaels, 94 Mont. 452, 23 P.2d 266, 271–72 (1933) (the state had a constitutional obligation to furnish adequate facilities for the education of all children in the state, and the existence of a federal Indian boarding school did not relieve the state of its duty to furnish public school facilities to the children of a proposed school district comprising reservation land); Piper v. Big Pine Sch. Dist., 193 Cal. 664, 226 P. 926, 930 (1924) (the establishment of a federal school did not relieve the state of its obligation to educate all children within its school districts, including Indian children).[42]

On the other hand, it may be that the plaintiffs are not entitled to a new high

---

41. The BIA school can accommodate 200 students but has a current enrollment of only about 115. Affidavit of Jerald Mikesell (exhibit K to Defendants' Exhibits) at 2, ¶ 3; Defendants' Exhibits ex. B. The plaintiffs have alleged that there are between about 40 and 50 students who would attend a secondary school at Navajo Mountain. See Complaint ¶ 22. See also supra note 4.

42. Carried to their logical extreme, these cases would suggest that the District also has an obligation to provide an elementary school at Navajo Mountain, even though the BIA already provides a school at Navajo Mountain for grades K through 8. It is doubtful whether such a duty exists under the Equal Protection Clause. Elementary school students at Navajo Mountain are not situated similarly to other elementary school students in the District. They receive a free

school at Navajo Mountain. "The decision as to when it is feasible to establish local secondary schools is peculiarly legislative and executive in nature." *Hootch v. Alaska State–Operated Sch. Sys.*, 536 P.2d 793, 804 (Alaska 1975). *See also id.* ("The question of the desirability of local secondary schools is related not only to the number of students residing in a community, but also to complex policy questions bearing on the quality of education afforded children by small local schools as opposed to larger regional schools or urban schools attended while boarding in private homes," questions that are "inappropriate for judicial resolution") (footnote omitted). The court need not reach that issue to decide the pending motions.

But even if the District has an obligation to provide a new high school at Navajo Mountain, it may not make sense to build a new high school. Even combined, the resources of the state, federal and tribal governments are not unlimited. Resources that could be spent in building a new high school might be better spent improving the quality of education at Navajo Mountain. It may make more sense, for example, to use the money a new school would cost to modify or expand the existing facility, increase the services offered at the existing facility and attract quality teachers and administrators to the existing school. The District must also consider the educational needs of other Native Americans within its boundaries, and educational dollars that could go into a new high school at Navajo Mountain might be better spent improving the quality of education for other Native Americans within the District, so long as it is not done at the expense of Navajo Mountain students.

It may well be, as the District suggests, that, because of Navajo Mountain's location (in a remote and isolated area straddling two states), the BIA is in the best position to provide the necessary educational services at Navajo Mountain.[43] If the BIA is willing to expand its operations at Navajo Mountain to include secondary education and to improve its existing operations, perhaps with the financial support of the State and District, so that, through the cooperative efforts of all parties, the students at Navajo Mountain receive educational opportunities comparable to those of other students in the District, the plaintiffs may not be entitled to anything more.

The court does not intend by these observations to limit in any way the parties' freedom to explore creative solutions to the problems of education at Navajo Mountain. The parties may be able to cooperate in establishing a high school at Navajo Mountain that can meet the needs of all the secondary-school-age children in the area, especially if the State of Arizona is willing to cooperate as well.[44] Utah law expressly authorizes local school boards to participate in the joint construction or operation of schools attended by

public education in their own community from the BIA—something no other students in the District apparently receive. The Equal Protection Clause does not require the District to offer elementary school services that simply duplicate or compete with the services the BIA already provides. Separate but equal facilities are not required by the Equal Protection Clause any more than they can now satisfy the Equal Protection Clause. *Cf. Brown v. Board of Educ.*, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954). Where one entity is already providing an education to on-reservation Indians, another entity's obligation to do so may well be minimized or excused. The plaintiffs suggest that the BIA school at Navajo Mountain is deficient. BIA schools are required to meet state minimum academic standards. *See* 25 C.F.R. § 36.2(e). If the BIA school does not, that would appear to be a matter the plaintiffs should take up with the BIA.

43. In its report on BIA education, the BIA's Office of Indian Education Programs noted that the BIA school system has become, "in effect, a system specializing in ... unusual circumstances and particular needs," such as those of children living in "the more isolated" reservation areas. Office of Indian Education Programs, *supra* note 1, at 35. *See also id.* at 37 ("Perhaps the most frequent factor explaining the presence of a BIA–funded school is the physical isolation of Indian communities and children"). The report recognizes Navajo Mountain as an area of great "physical and cultural isolation." *Id.* at 39.

44. The president of the Navajo Mountain Chapter of the Navajo Nation estimates that there are about forty-three high-school-age children who live on the Arizona side of the Navajo Mountain area. *See* Second Affidavit of Jamie Holgate (appendix 3 to Plaintiffs' Appendix) at 5, ¶ 8. The parties agree that the District has no responsibility to educate these children, and the State of Arizona is not a party to this action.

children residing in the district and children residing in other districts outside the state. *See* Utah Code Ann. § 53A–3–402(3) (Supp. 1994).

In short, the ultimate issues in this case involve difficult questions about how limited resources should best be allocated. Courts are ill equipped to resolve those questions. *See White v. Califano*, 437 F.Supp. 543, 555 (D.S.D.1977), *aff'd*, 581 F.2d 697 (8th Cir. 1978). Those decisions are best left to the policy makers. The parties in this case are experts in the field of education and in the special problems facing Navajo Mountain. The parties themselves are in the best position to determine the best way to provide a quality education for all the children at Navajo Mountain. The parties responsible for education at Navajo Mountain should have the opportunity to explore solutions to the problems of education at Navajo Mountain, with the input of those affected by their decisions, before the court imposes any solution on them. As long as the policy makers observe constitutional and statutory man-dates, they have wide discretion to determine how best to meet their obligations. The court is always ready, however, to redress violations of law. *Cf. Beard v. Board of Educ.*, 81 Utah 51, 16 P.2d 900, 903 (1932) (if the action of a board of education is within the powers conferred on it by the legislature, courts will not substitute their own judgment for that of the board, but they can entertain suits to enjoin school authorities from abusing their authority or acting beyond the scope of their powers or in violation of law).

For the foregoing reasons, the defendants' motion for summary judgment and the plaintiffs' motion for partial summary judgment are DENIED. The plaintiffs' motion for class certification is also DENIED, without prejudice to the plaintiffs' right to reapply for class certification at a later date.

IT IS SO ORDERED.